**UNITED STATES of America,**
**Plaintiff,**

**v.**

**John L. MATTHEWS, Defendant.**

**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Louis GOLDSTEIN and Selma Goldstein, Defendants.**

**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Walter D. HEINZE et al., Defendants.**

**Crim. A. Nos. 2219, 2222 and 2238.**

United States District Court,
D. Delaware.
Nov. 14, 1972.

See also, D.C., 56 F.R.D. 52.

Norman Levine, U. S. Atty., Richard D. Levin, Asst. U. S. Atty., Wilmington, Del., Daniel Cochrane, Sp. Asst. U. S. Atty., Philadelphia, Pa., and Gerard Martin, Sp. Asst. U. S. Atty., Washington, D. C., of counsel, for the United States.

David Roeberg, of Sullivan, Potter & Roeberg, Wilmington, Del., for defendant John L. Matthews.

E. N. Carpenter, II, Thomas P. Sweeney and Robert Meyer of Richards, Layton & Finger, Wilmington, Del., for defendants Louis and Selma Goldstein.

Robert K. Payson, Peter M. Sieglaff of Potter, Anderson & Corroon, Wilmington, Del., and Max Wild, New York City, of counsel, for defendant Walter D. Heinze.

H. Albert Young and Stuart B. Young, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant Maxwell Feller.

Charles F. Richards, Jr., Thomas P. Sweeney and Robert Meyer of Richards, Layton & Finger, Wilmington, Del., for defendant Frederick W. Andrews.

S. Samuel Arsht and Walter L. Pepperman, II, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant D. Irving Obrow.

## OPINION AND ORDER

LATCHUM, District Judge.

The defendants in each of these three criminal actions were indicted for various federal offenses [1] in March of 1972

---

1. In C.A. No. 2219, Matthews, a bank teller of a federally insured bank, was charged in a one count indictment with the embezzlement and misapplication of $1,138.00 in violation of 18 U.S.C. § 656. In C.A. No. 2222, Louis and Selma Goldstein were charged in Counts I and III with willfully making and subscribing to false joint income tax returns for the years 1964 and 1966 in violation of 26 U.S.C. § 7206(1) and Louis Goldstein was charged in Count II with willfully failing to file a federal income tax return for the year 1965 in violation of 26 U.S.C. § 7203.

In C.A. No. 2238, the Grand Jury returned a four count indictment. Count I charged all the defendants with conspiracy while employed as executives of International Latex Corporation to willfully conceal the true nature of certain payments to a labor consultant in violation

by the same Grand Jury of this District. Shortly thereafter the defendants moved to dismiss the indictments relating to each of them on the grounds that the composition of the indicting Grand Jury violated the provisions of the Jury Selection and Service Act of 1968 (the "Act"), 28 U.S.C. § 1861 et seq., as well as the terms of The Plan of This Court For the Random Selection of Grand and Petit Jurors (the "Plan").[2] Because the motions filed in all three cases raised identical legal issues, they were consolidated for the purpose of discovery [3] and an evidentiary hearing.[4]

Before considering the specific challenges to the jury selection process under attack in these cases, some note should be taken of the background of the Act. Under the Judiciary Act of 1789 the qualification of federal jurors was determined by the law of the forum state, Act of September 24, 1789, Ch. 20, § 29, 1 Stat. 73, 88, with the consequence that the standards of competency to serve on federal juries varied from state to state and all the defects in the state's jury selection process—whether of constitutional or policy dimensions—were injected into the federal jury selection process. Many of the constitutional deficiencies of the state standards began to come to the forefront as a result of litigation in the federal courts. As early as 1880 the Supreme Court set aside a conviction on equal protection grounds because of the statutory exclusion of Negroes from state jury service. Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880). The following year the Court made it clear that the constitutional infirmity of the class exclusion of Negroes from jury service did not turn upon whether the exclusion was based upon a statute. Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (1881). Attacks on the jury selection process materially increased particularly during the 1935–1965 period.[5] These attacks having become somewhat of an embarrassment to the federal judiciary, Chief Justice Stone in 1941 initiated action to study federal jury selection by appointing a

of 29 U.S.C. § 186 and 26 U.S.C. § 7206 (2), to willfully fail to file certain reports in violation of 29 U.S.C. §§ 433 (a) and 439(a), to willfully cover up facts concerning the payment of moneys to a labor consultant in violation of 18 U.S.C. § 1001 and of aiding and assisting in the preparation of false and fraudulent income tax returns of Stanley Warner Corporation in violation of 26 U.S.C. § 7206(2). Counts II and III charge defendants Heinze, Feller and Obrow of willfully aiding the preparation of fraudulent income tax returns for Stanley Warner Corporation for the fiscal years ending August 1965 and 1966 in violation of 26 U.S.C. § 7206(2). Count IV charges defendant Obrow with aiding the willful failure to file a report showing the payment of money to a labor relations consultant in violation of 29 U.S.C. §§ 433(a) and 439(a).

2. Def.Exh. No. 1.

3. The Court granted defendants extensive discovery to inspect, reproduce and copy the contents of all records and papers used by the Clerk in Grand Jury selection.

4. An evidentiary hearing was held on August 30, 1972.

5. See, e. g., Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Hale v. Kentucky, 303 U.S. 613, 58 S.Ct. 753, 82 L.Ed. 1050 (1938); Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L. Ed. 680 (1942); Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); Thiel v. Southern Pac. Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L. Ed. 76 (1947); Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Reece v. Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955); Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed. 2d 991 (1958); Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964); Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

Committee of the Judicial Conferences on Selection of Jurors. After two years of study, the most significant recommendation was the adoption of an act requiring uniform qualifications of jurors in federal courts which the Judicial Conference approved.[6] No act was passed, however, and for the next fourteen years the Committee, later known as the Committee on the Operation of the Jury System, consistently advocated uniform qualifications for federal jurors. It was not until 1957 that Congress enacted the Civil Rights Act of 1957 which for the first time eliminated all reference to state standards for selecting federal jurors and established independent federal qualifications.[7] While the latter statute deleted the requirement that a federal juror be qualified under state law and clearly substituted federal standards for determining who must be excluded, it did not provide clear guidelines for determining who must be included. As a result uniformity was not achieved. Generally three principal methods were used by the Clerks and Jury Commissioners in procuring names of prospective jurors: from names suggested by "key men" or organizations, from various public lists such as directories, and from names recommended by friends and acquaintances. While this system of selection performed very well and had the endorsement of the Judicial Conference, it was a fact that many eligible jurors were excluded by the system without rational justification.[8] With the growing pressure for civil rights legislation, it became apparent that the non-objective selection systems being used did not satisfactorily insure that each qualified citizen would have an equal opportunity to be considered for jury service. In 1966 the Fifth Circuit sitting en banc announced unequivocally in *Rabinowitz v. United States*, 366 F.2d 34 (C.A.5, 1966) that if the past selection systems were used, the selectors could no longer impose their own subjective standards in the process and must produce jury lists which reflected a fair cross-section of the community.

A month following the *Rabinowitz* decision, the Committee on the Operation of the Jury System was reconstituted by the Judicial Conference of the United States for a study of jury selection procedures. In response to the Committee's recommendation, the Conference at its September 12, 1966 session "endorsed the principle of random selection of jurors in a manner that would produce a fair cross-section of the community in the district or division in which the court is held." The Committee after prolonged study drafted a bill approved by the Judicial Conference which Senator Joseph Tydings introduced on February 16, 1967 as S. 989. Although President Johnson sent Congress the Civil Rights Bill of 1967, Title I of which was substantially the same as S. 989, Congress responded favorably to the Judicial Conference bill which, after several amendments, was enacted into law on March 27, 1968 as the Jury Selection and Service Act of 1968.

The primary purposes of the Act were (1) to insure all litigants in federal courts entitled to trial by jury of the *right* to grand and petit juries selected at random from a fair cross-section of the community, (2) to provide all citizens with the *opportunity* to be considered for service on grand and petit juries,[9] and (3) to prohibit exclusion from such service on account of race, color, religion, sex, national origin or economic status.[10]

Specifically, the Act required that each United States District Court devise and place into operation a written plan for the random selection of jurors. Prospective jurors are to be drawn from voter registration lists or lists of actual voters within the district. However, the

---

6. 42 F.R.D. 354, 355.

7. Act of Sept. 9, 1957, Pub.L. No. 85–315, ▮▮▮▮▮▮▮▮

8. 26 F.R.D. at 470.

9. 28 U.S.C. § 1861.

10. 28 U.S.C. § 1862.

plan must prescribe some other source of names in addition to voter lists where necessary to foster the policy and protect the integrity of the Act.[11]

A master jury wheel is created into which the names of those randomly selected are placed, and which must be emptied and refilled periodically at times specified in the plan.[12] Names are drawn by lot from the master jury wheel and those determined to be qualified and not exempt or excused according to the terms of the plan are placed in the qualified jury wheel. The qualified jury wheel is the source from which grand and petit juries are selected by lot.[13]

A defendant in a criminal case, as was done here, may challenge the district court's jury selection plan on the ground of *substantial* failure to comply with the provisions of the Act.[14]

The Plan for this District was initially prepared and submitted to the Judicial Council for the Third Circuit on July 25, 1968. The proposed plan was examined by the Reviewing Panel and after some minor changes was approved on September 23, 1968 [15] as required by the guidelines issued by the Committee on the Operation of the Jury System.[16]

Because the State of Delaware had maintained permanent registration lists since 1956 which are added to every two years by supplemental registrations,[17] the Court, when devising the Plan, was fully aware, and so found, that the permanent lists provided a broader base as a source for juror selection than would be provided by any list of actual voters. Indeed, the record shows that in the biennial general elections held in Delaware between 1956 and 1966, those registered to vote, who actually voted, ranged from a low of 66.5% in the non-presidential election of 1962 to a high of 94.6% in the 1956 presidential election.[18] It was for this reason that the Court determined that voter registration lists represented a fair cross-section of the community in this District. Accordingly, Sections 3 and 4 of the Plan required the names of prospective jurors to be randomly selected from such lists for deposit in the master jury wheel. Those sections also contemplated that the master jury wheel would be filled initially from voter registration lists existing in 1968 and thereafter would be emptied and refilled within six months after the 1972 presidential election and each presidential election following thereafter.[19]

Defendants claim that the Plan is defective in seven respects. The defendants' first objection is based on the fact that the Plan provides for emptying and refilling the master jury wheel from voter registration lists every four years after each presidential election. They contend that the Act requires the master jury wheel to be refilled at least every two years. Specifically, they argue that since voter registration lists were generated for a state-wide primary election held in June of 1970, the master jury wheel should have been refilled then from that source so that the indicting Grand Jury, which was drawn on September 2, 1970 for service beginning September 22, 1970, would have come from the 1970 registration lists rather than from the voter lists obtained by the Clerk from the State Election Commissioner on September 7, 1968.

---

11. 28 U.S.C. § 1863(b)(2).

12. 28 U.S.C. § 1863(b)(4).

13. 28 U.S.C. § 1866(a).

14. 28 U.S.C. § 1867(a).

15. 28 U.S.C. § 1863(a).

16. Guidelines To Assist District Courts In Conforming To The Jury Selection and Service Act of 1968, dated May 6, 1968, p. 19.

17. 15 Del.C. §§ 1102 and 1103.

18. Def.Exh. 7, p. 14.

19. It should be noted that on April 6, 1972 Congress enacted Public Law 92–269, 86 Stat. 117, which required every District Court to refill its master jury wheel by September 1, 1973 from the voter register lists or list of actual voters in the 1972 general election.

This argument is based on 28 U.S.C. § 1869(c), which defines "voter registration lists" to mean:

"the official records maintained by State or local election officials of persons registered to vote *in either the most recent State or the most recent Federal general election. . . .*" (Emphasis added).

In support of this argument, the defendants rely upon an excerpt from the House Report on the Act [20] which states that the above quoted provision is meant to—

"insure that the list used will in any event not be more than 2 years old."

Despite this latter statement, it is clear upon analysis that the above quoted language of § 1869(c) did not require that the master jury wheel be refilled from voter registration lists every time state and federal elections are held regardless of their frequency. The Act fully contemplated that there would be reasonable periods of stability of the names placed in the master jury wheel. This becomes certain from the express provision of § 1863(b)(4) which reads:

"The plan shall provide for *periodic* emptying and refilling of the master jury wheel at *specified* times." (Emphasis added).

This provision would be a complete nullity if the wheel had to be emptied and refilled from voter registration lists generated by every state-wide general or primary election. Indeed the guidelines [21] issued by the Committee On The Operation Of The Jury System, which drafted the Act, stated:

"The Act requires the Plan to fix the time when the master jury wheel must be emptied and refilled. In most cases it is anticipated this will be every 2 or 4 years. The master wheel will then be filled once to last this *entire* period." (Emphasis added).

The real purpose of § 1869(c) was to insure that, at the *time specified in the Plan* for refilling the master jury wheel, the most recent voter registration list would be used. As the House Report [22] pointed out, prior bills had been found objectionable, because they provided for specified times for refilling the wheel, and the purpose of § 1863(b)(4) was to allow flexibility to each district court in selecting the times for refilling the master jury wheel which it deemed reasonable and appropriate. Had Congress intended to require refilling each time a state-wide election was held, it could and would have expressly so provided. Similar arguments were made and rejected in United States v. Kuhn, 441 F.2d 179, 181 (C.A.5, 1971) and United States v. Guzman, 337 F.Supp. 140, 145 (S.D.N.Y.1972). Accordingly, the Court finds no merit to defendants' first objection.

The defendants' second contention is that the voter registration lists used as a source to fill the master jury wheel initially in December of 1968 were not an official record of persons entitled to vote at the 1968 presidential election and thus failed to comply with § 1869(c) which defined "voter registration lists" to mean "the official records maintained by State . . . election officials of persons registered to vote in . . . the most recent . . . Federal general election."

Actually the voter registration list used by the Clerk to fill the master jury wheel initially was an official list of all Delaware registered voters as of September 1, 1968. This list was furnished to the Clerk by the Delaware Election Commissioner after September 7, 1968 and was the only list then available.[23]

---

20. 2 U.S.Code Cong. and Admin.News, 90th Cong., 2nd Session, 1968, p. 1807.

21. Guidelines To Assist District Courts In Conforming To The Jury Selection and Service Act of 1968, dated May 6, 1968, p. 50.

22. 2 U.S.Code Cong. and Admin.News, 90th Cong., 2nd Session, 1968, p. 1800.

23. Tr. 66, 67, 71–73.

This list was mandated by Delaware law, 15 Del.C. § 305, and is made available to all political parties prior to the November general election.[24] There were additional registrations of persons between September 1, 1968 and the final registrations in October of 1968. The final list of all those registered to vote in the 1968 presidential election was not completed by the Election Commissioner and available until the week of February 2, 1969.[25] However, there was a partial revised list prepared by the Commissioner as of November 1, 1968 but this list was incomplete as it did not include the supplemental registrations in New Castle County.[26] These were not received by the Commissioner from the New Castle County Department of Elections until November 20, 1968.[27] In 1968, voter registration lists were not computerized but were prepared on unit record equipment.[28]

The Plan was approved by the Reviewing Panel on September 23, 1968 and was to go into effect on December 22, 1968.[29] As soon as the Plan was approved, the Clerk got in touch with the Election Commissioner to obtain the most recent available list of registered voters. The list was received about two months before the Act was to become effective[30] and was the most recent list available of registered voters which had been prepared for official purposes on September 7, 1968.[31] Thus, the Clerk with a very limited staff had to manually select on a random basis 2,400 names from the September 7 lists to be placed in the master jury wheel and had to do all the other clerical minutiae necessary to put the selection process system into operation within a two month period.[32] It would have been impossible for the Clerk to complete the task required within the time limitation without using the September 7 lists. Thus, the job could not have been done had the Clerk waited for the incomplete revised list which was generated on November 1, 1968.

The Court concludes that the September 7 lists fully complied with the primary objective of the Plan and Act in that the prospective jurors selected represented "a fair cross section of the community" and there was no discrimination or exclusion of any group from jury service. The voter registration lists used were the most recent "official records" available in time to permit the Clerk to comply with the statutory intent and enable the new jury selection system to proceed in accordance with the stated purposes and policy of the Act. There was substantial compliance with the Plan and Act and the defendants' second objection must be rejected.

The defendants' third claim is that a double drawing procedure utilized by the Clerk resulted in the selection of an unrepresentative geographical sample of prospective jurors placed in the master wheel in contradiction of the Act. This argument is grounded on the following facts: § 1863(b)(4) of the Act required that Plans shall fix a minimum number of names to be placed initially in the master jury wheel, which should be at least one-half of 1 percent of the total number of persons on voter registration lists, or if the Court believed that number of names to be cumbersome or unnecessary, Plans could fix a smaller number of names but not less than 1,000. The Court when preparing the Plan believed a number certain should be used for the names to be placed in the master wheel rather than a percentage. It determined on 2,400 names which were then believed to be approximately 1 percent of 240,000 registered voters that

24. Tr. 66.

25. Tr. 67, 72.

26. Tr. 67, 71, 72.

27. Tr. 67.

28. Tr. 66, 29.

29. Tr. 10; Def.Exh. 1.

30. Tr. 14–15.

31. Tr. 11, 67–68.

32. Tr. 14–21; 23; 29–31.

the Election Commissioner had anticipated would be registered to vote in the presidential election of 1968.[33]

■ However, when the September 7, 1968 registration lists were obtained it turned out that there were only 234,038 registered voters listed.[34] Upon receipt of the list, the Clerk started with a randomly selected name from among the first 100 names listed in the first election district of the first representative district in New Castle County, and then selected every one hundredth name thereafter.[35] However, upon going through the entire list which totalled less than 240,000 names, the selection of 1 percent produced less than the 2,400 names called for by the Plan.[36] When the Clerk discovered this, he went back to the first part of the list and selected an additional 62 names randomly [37] from New Castle County and none from Kent or Sussex Counties.[38] Thus, defendants contend that the double drawing of 62 additional names from New Castle County to make up the 2,400 names required by the Plan violated § 1863(b)(3) of the Act which required Plans to specify detailed procedures for selecting names for the master jury and stated:

"[These procedures] shall ensure that each county, parish, or similar political subdivision within the district or division is *substantially* proportionally represented in the master jury wheel for that judicial district. . . ." (Emphasis supplied).

The double drawing of 62 additional names of prospective jurors from New Castle County which were placed in the master jury wheel along with 2,338 names which had been proportionally drawn from all three counties did not amount to a "substantial" failure to comply with the Act, § 1867(a). Moreover, § 1863(b)(3) only requires "substantially proportional" representation from all counties of the district. The minor deviation which occurred here giving a slight underrepresentation to Kent and Sussex County was not the result of a conscious effort to exclude or discriminate. The 2,338 names proportionately selected and the 62 additional names randomly drawn from New Castle County have not been shown to have deviated from representing a true cross section of the community which is the primary objective of the Act and Plan. The Act and Plan were not intended to guarantee technical perfection but to insure substantial compliance with the Act. The Court finds that this criterion was met.

■ Defendants' fourth objection is grounded on § 1863(b)(7) which provides that plans shall:

"fix the distance, either in miles or in travel time, from each place of holding court beyond which prospective jurors residing shall, on individual request therefor, be excused from jury service on the ground of undue hardship in traveling to the place where court is held."

The Plan of this district does not provide for any excuse from jury service on account of distance from court. As the House Report [39] pointed out:

"This provision recognizes that, in certain States, persons residing hundreds of miles from the courthouse may be able to take advantage of modern transportation facilities whereas those residing relatively close to the court may encounter transportation

33. Tr. 18.

34. Tr. 31.

35. Tr. 18.

36. Tr. 19.

37. After the Clerk selected the last prospective juror from the Sussex County list, there were still a few names left which the Clerk counted and proceeded back to the New Castle list to the first one hundredth name and thereafter selected the one hundredth name until an additional 62 prospective jurors were obtained. (Tr. 50).

38. Tr. 19–20, 31–32, 49–51.

39. 2 U.S.Code Cong. and Admin.News, 90th Cong., 2nd Session, 1968, p. 1801.

conditions that would make their travel time substantially longer. *In short, the bill allows each district to assess its own setting so as to insure that people in certain groups are not burdened by geographical and transportation hardship."* (Emphasis added).

In fact, the guidelines [40] issued by the Committee On The Operation Of The Jury System, in discussing the provision for an excuse from service based on distance, stated:

". . . a court may find that no basis exists in excusing anyone on the basis of undue hardship in traveling, if in fact all parts of the division or district are reasonably accessible for jurors."

Following this guideline, the Court determined that because of the small and compact size of Delaware, there was no location within the district more than approximately 100 miles from the courthouse. Hence, no valid or rational basis existed at that time for the Plan to grant a blanket excuse from jury service based solely on distance from the court. There is no merit to defendants' fourth objection.

■ Defendants' fifth objection is that the Plan is defective in that it does not specify the procedures for assigning persons to grand and petit jury panels as required by § 1863(b)(9). Defendants misconstrue the Plan; it applies to both grand and petit jurors who are drawn randomly when needed from the qualified jury wheel. Two methods of jury selection were not contemplated. Section 1863(b)(9) simply allowed the use of "rotation" methods of jury "pools" or other devices of jury use. Courts were thus permitted to bunch cases for jury trials, and by scheduling several jury trials for a particular period, and in larger districts, using multiple jury sections, could achieve a maximum degree of juror utilization with a minimum number of jurors.[41] The Plan is not defective in this respect.

■ Defendants' sixth objection states that the Plan is defective because it relies on voter registration lists without any investigation having been undertaken to determine whether such lists represented a fair cross section of the community. The defendants then attempt to compare the 1970 census figures with the voter registration lists of September 7, 1968 and conclude that "in all probability the registration lists do not represent a fair cross section of the community since in 1970 there is a slight variation in the percentage of white and negro persons of voting age who register." Even assuming a comparison of 1968 and 1970 figures is appropriate, defendants have completely failed to sustain their burden of showing a systematic exclusion of any identifiable group within the community. United States v. Parker, 428 F.2d 488, 489 (C.A.9, 1970), cert. den. 400 U.S. 910, 91 S.Ct. 155, 27 L.Ed.2d 150 (1970); United States v. Dorsey, 462 F.2d 361, 362 (C.A.3, 1972). Delaware, unlike some of the southern states, has no history of the coercive exclusion of negroes from voter registration lists. In the absence of any showing of intentional exclusion from voter lists based on color, there was no necessity to seek supplemental sources for names of prospective jurors. Each Committee of Congress and of the Judicial Conference which has studied the matter of random jury selection in depth has unanimously endorsed voter registration lists as the best cross-sectional list of non-racial classes.[42] Defendants' sixth objection is overruled.

40. Guidelines To Assist District Courts In Conforming To The Jury Selection and Service Act of 1968, dated May 6, 1968, p. 17.

41. Id. p. 19; 2 U.S.Code Cong. and Admin.News, 90th Cong., 2nd Session, 1968, p. 1801.

42. 42 F.R.D. 361; 2 U.S.Code Cong. and Admin.New, 90th Cong., 2nd Session, 1968, p. 1799; Note, 52 Va.Law Rev. 1069, 1132–1133 (1966).

The defendants' final contention is that the Court when determining whether prospective jurors should be excluded, exempted or disqualified applied less strict standards than were justified under the Plan and Act. In support of this argument, they refer to 49 persons whom they allege were relieved of jury service by the application of improper standards. Upon reviewing the questionnaires and other objective data of these 49 persons, the Court finds with respect to 32 of them that the defendants have incorrectly analyzed the objective data upon which the Court relied and concludes there was no error in relieving them of jury service under the Plan and Act.[43]

■ Turning now to a consideration of the 17 remaining persons relieved of jury service, we find that four [44] were practical nurses who for a long time had been regularly and actively engaged in the nursing profession. While none of them claimed to be "registered nurses" (the term used in § 5(4) of the Plan), the objective data indicated that they were performing substantially the same duties with comparable responsibilities as registered nurses. The Court when devising the Plan determined that jury service by registered nurses would entail undue hardship or extreme inconvenience and, if requested, they should be excused from service. § 1863(b)(5). Construing the Plan to cover nurses who regularly performed substantially the same duties as registered nurses did not amount to such a substantial deviation from the Plan as to provide grounds for challenging the indicting Grand Jury. This is so because the nurses excused were an objectively identifiable class of persons performing the same work as registered nurses and their excuse from service upon request was not inconsistent with the Act or Plan.

Ten of the prospective jurors were excused by the Judge supervising the jury selection process based on objective data which showed individual undue hardship or extreme inconvenience. For instance, No. 394 was excused to care for his wife who had been totally disabled and confined to a wheel chair since 1951 and he

43. Nos. 1777, 1887 and 2264 certified that they were members of the clergy and were properly excused under § 5(2) of the Plan; No. 1766, a practicing Mennonite affirmed he could not, on deeply held religious grounds, conscientiously serve as a juror and was excused, Cf. Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); No. 2379 was excused under § 5(3) of the Plan as a woman having custody of an illegitimate 2 year old child; Nos. 36, 435, 559, 1345, 1365, 1482 and 1921 were excused under § 5(4) of the Plan as each certified they were practicing registered nurses; No. 1717 was excused under § 5(5) of the Plan because he certified he had State jury service within the past 2 years; Nos. 1149 and 2187 each certified they were actually teaching in private schools and excusable under § 5(6) of the Plan; Nos. 297, 551 and 1051 all certified they were business proprietors with less than 5 employees and excusable under § 5(7) of the Plan; No. 1791 was exempt as a police officer of the State (a State College) under § 6(2) of the Plan; No. 2112 was exempt as a volunteer fireman at Seaford, Delaware pursuant to § 6(2) of the Plan;

Nos. 1896 and 2327, both public officers, one in the executive and the other in the judicial branch of the State Government, were exempt under § 6(3) of the Plan; the certifications of Nos. 469, 1193 and 1438 certified that they had not been residents or were not residing in the district and were disqualified under § 7(1) of the Plan; No. 1757 who certified she had high blood pressure and a nervous condition and under the weekly care of a physician was disqualified under § 7(4) of the Plan; No. 1139 was disqualified as a convicted felon under § 7(5) of the Plan; Nos. 374, 818, 846, 1893 and 2233 were excused by the Court only temporarily on the basis of extreme hardship or inconvenience under 28 U.S.C. § 1866 (c)(1).

44. No. 555 certified she was a licensed practical nurse at the Riverside Hospital performing the same duties as a registered nurse; No. 688 was the only dental assistant (nurse) to a practicing dentist; No. 1674 was a nurse at the Emily P. Bissell Hospital; and No. 2065 was a private nurse who for 12 years had been caring for a lady bedridden with polio on a rocking bed.

could not afford to place her in a nursing home or engage a person to look after her. No. 518, a public school teacher who had given up her job three years before to nurse and take care of her husband about to undergo his fourth operation, was excused. No. 1651 was excused as she was the sole support of her husband who had become an invalid by reason of his second heart attack. No. 1776, a 62 year old daughter who was the sole care and housekeeper for her 92 year old mother, was also excused. No. 2040, a 68 year old wife who lived in Sussex County without transportation and was required at home to care for her 81 year old husband suffering from a heart condition, was excused. No. 2271 was excused to take care of his wife who suffered from a serious heart condition and diabetes. No. 1513, the sole proprietor and head of a small business that had five employees including himself, was excused as he was the only salesman and the next six to eight months were the most critical time for his sales effort. No. 2275 was excused as he was operating a small business for the widow of the recently deceased owner and could not leave the business unsupervised. No. 1621, a cook and housekeeper for five priests at St. John's Rectory in Newark, was excused at her request and that of the Pastor on the ground that it was impossible to obtain a replacement for her. No. 826, a library clerk at a public high school, was excused at her request and the Director of Personnel as she was badly needed in her position.

▆▆▆▆ All of these cases from the objective data submitted indicated extreme inconvenience or undue hardship. There is no question that the Court upon such a showing may excuse a person from jury duty "for such period as the Court deems necessary," at the conclusion of which period such person shall be summoned again for jury service. 28 U.S.C. § 1866(c)(1). Through an unintentional oversight the excuses granted on the record appear to be permanent. They were not so intended but were in-

tended to be only temporary and the persons should have been so notified.

▆▆▆▆ In addition, three other persons were determined to be disqualified under the Plan. No. 681 was disqualified as she advised the Court that she expected to move her permanent residence to North Carolina in a few months. Since members of the grand jury are called to serve over an 18 month period and the members of a petit jury panel are required to serve for 30 days of reporting or sitting, it was obvious she would not remain in the district long enough to render effective or usual jury service. No. 588 was also disqualified under § 7(5) of the Plan for being charged with a felony. This disqualification now turns out to be a mistake as No. 588 was charged only with a misdemeanor. No. 1822 was disqualified under § 7(5) of the Plan when he certified that he had been convicted of a felony but that his civil rights had been restored by pardon or amnesty. However, since no evidence was furnished supporting the latter statement and no supporting information could be obtained from other sources, he was disqualified.

The Court concludes that these few technical errors in administering the complicated jury selection process under the Plan and Act were not so substantial as to afford a valid basis for challenging the Grand Jury which indicted the defendants. The minor deviations that occurred were entirely unintentional and insignificant. None of them was materially inconsistent with the policy and purpose of the Act. The Act and Plan, as administered, randomly selected the indicting Grand Jury from a fair cross section of the community without excluding any cognizable group on account of race, color, religion, sex, national origin or economic status. Those few persons drawn and relieved as jurors were excluded, or found exempt or disqualified solely on the basis of objective data and not by subjective standards.

Accordingly, defendants' motions to dismiss will be denied.