HILL *v.* TEXAS.

No. 1119.   Argued May 11, 1942.—Decided June 1, 1942.

*Mr. J. Forrest McCutcheon* submitted for petitioner.

*Messrs. Pat Coon,* Assistant Attorney General of Texas, and *Spurgeon E. Bell,* with whom *Mr. Gerald C. Mann,* Attorney General, was on the brief, for respondent.

Mr. Chief Justice Stone delivered the opinion of the Court.

Petitioner, a negro, was indicted for the crime of rape by the grand jury for Dallas County, Texas.   When the case was called for trial he submitted to the court his verified written motion to quash the indictment because he had been denied the equal protection of the laws guaranteed by the Fourteenth Amendent.   The grounds of his motion were that negroes had been excluded from the

grand jury which returned the indictment, and that the jury commissioners and other state officers charged with the duty of organizing and impanelling grand juries in Dallas County have for many years systematically excluded, and in this case did exclude, negroes from the grand jury because of their race.

After hearing evidence the court denied the motion and proceeded with the trial, which resulted in a verdict and judgment of conviction. The Texas Court of Criminal Appeals upheld the trial court's ruling on the motion and affirmed the judgment. — Tex. Cr. —; 157 S. W. 2d 369. It held that petitioner had not sustained the burden of proof resting on him to show that the failure to select negroes for service on the grand juries in Dallas County was because of their race rather than their lack of statutory qualifications for grand jury service. We granted certiorari, *post,* p. 655, to inquire whether the court's ruling is consonant with our decisions in *Neal* v. *Delaware,* 103 U. S. 370; *Pierre* v. *Louisiana,* 306 U. S. 354; and *Smith* v. *Texas,* 311 U. S. 128.

Article 339 of the Texas Code of Criminal Procedure provides that a grand juror must be a citizen of the state and county, qualified to vote there, a freeholder within the state or a householder within the county, of sound mind and good moral character, able to read and write. He must not have been convicted of a felony or be under indictment or other legal accusation of any felony. The section directs that "whenever it shall be made to appear to the court that the requisite number of jurors who have paid their poll taxes cannot be found within the county, the court shall not regard the payment of poll taxes as a qualification for service as a juror."

In rejecting the proof of discrimination on which petitioner relied, the Texas Court of Criminal Appeals said "appellant assumed the burden of sustaining his allega-

tions by proof. He attempted to do so by showing certain facts from which, as he claims, such a conclusion could be reasonably drawn. He showed that 58,000 white persons and 8,000 negroes paid poll taxes in Dallas County, but the record is silent as to how many of them were male and how many were female persons; nor is it shown how many of these male persons could read and write; nor how many of them were freeholders in the state or householders in the county." And the State argues here that in these circumstances there can be no inference that long-continued failure of the county officials to select members of the colored race to serve on grand juries is discriminatory, without proof that there are members of that race living in the county who are qualified to serve as grand jurors.

The state filed a general denial of petitioner's motion, but submitted no answering affidavits, and called no witnesses, and so the only question before us is whether petitioner made out a prima facie case of the discriminatory exclusion of negroes from the grand jury. Petitioner called as witnesses two of the three grand jury commissioners, whose duty it is to summon sixteen men, of whom twelve are selected for service on each grand jury in Dallas County (articles 338, 357). They testified that the commission had summoned, for service on the grand jury which returned the indictment, members of the white race with whom they were acquainted and whom they knew to be qualified to serve. They testified that members of the commission had no prejudice against the colored race; that they discussed the possibility of selecting negroes to serve, and that they knew negroes in the county. One testified: "I personally did not know of a qualified negro that I thought would make a good grand juror." The other testified he did not know which of the negroes of his acquaintance could read and write. Both testified that they made no investigation or inquiry to ascertain

whether there were negroes in the county qualified for grand jury service.

An assistant district attorney for the county, who had lived in Dallas County for twenty-seven or twenty-eight years and had served for sixteen years as a judge of the criminal court in which petitioner was tried and convicted, testified that he never knew of a negro being called to serve on a grand jury in the county. The district clerk of the county, whose duty it is to certify the grand jury list to the sheriff (article 344), knew of no citations issued for negroes to serve upon the grand jury. A colored witness, a property owner and poll tax payer in Dallas County, engaged in the insurance and bonding business, and resident in the county for fifty-four years, testified that he had often been called to serve as a petit juror but had never known of any colored man to be called as a grand juror. Two other colored witnesses, property owners and poll tax payers, who had lived in the county for twenty-five years, had never known of a negro to be called on a grand jury. There was also evidence already mentioned which the Texas Court of Criminal Appeals found sufficient to show that of the 66,000 poll tax payers in the county 8,000 were negroes.

Another witness estimated the total negro population of the county as 55,000. Actually this was an underestimate, for the 1940 census shows the total population of the county to be 398,564, of whom 61,605 are negroes, and, of these, 19,133 are males twenty-one years old or more. The census of 1930 showed only 7.5 percent of the negro population of the county to be illiterate. The census data of 1940 show that of the 17,263 male negroes in the county who were twenty-five years of age or more, 16,107 had attended grade school or higher institutions of learning. Of these, 7,979 had attended grade school from five to eight years; 1,970 had attended high school from

one to three years, and 1,124 for four years; 466 had attended college from one to three years, and 284 for four years or more.

We think petitioner made out a prima facie case, which the State failed to meet, of racial discrimination in the selection of grand jurors which the equal protection clause forbids. As we pointed out in *Smith* v. *Texas, supra,* 131, chance or accident could hardly have accounted for the continuous omission of negroes from the grand jury lists for so long a period as sixteen years or more. The jury commissioners, although the matter was discussed by them, consciously omitted to place the name of any negro on the jury list. They made no effort to ascertain whether there were within the county members of the colored race qualified to serve as jurors, and if so who they were. They thus failed to perform their constitutional duty—recognized by § 4 of the Civil Rights Act of March 1, 1875, 8 U. S. C. § 44, and fully established since the decision in 1881 of *Neal* v. *Delaware, supra*—not to pursue a course of conduct in the administration of their office which would operate to discriminate in the selection of jurors on racial grounds. Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case, discrimination necessarily results where there are qualified negroes available for jury service. With the large number of colored male residents of the county who are literate, and in the absence of any countervailing testimony, there is no room for inference that there are not among them householders of good moral character, who can read and write, qualified and available for grand jury service.

More than sixty years ago, in *Neal* v. *Delaware, supra,* 397, a case substantially like the present, this Court laid down the rule which we think controlling here:

"The showing thus made, including, as it did, the fact (so generally known that the court felt obliged to take judicial notice of it) that no colored citizen had ever been summoned as a juror in the courts of the State,—although its colored population exceeded twenty thousand in 1870, and in 1880 exceeded twenty-six thousand, in a total population of less than one hundred and fifty thousand,—presented a *prima facie* case of denial, by the officers charged with the selection of grand and petit jurors, of that equality of protection which has been secured by the Constitution and laws of the United States.   It was, we think, under all the circumstances, a violent presumption which the State court indulged, that such uniform exclusion of that race from juries, during a period of many years, was solely because, in the judgment of those officers, fairly exercised, the black race in Delaware were utterly disqualified, by want of intelligence, experience, or moral integrity, to sit on juries."

And recently we held in *Pierre* v. *Louisiana, supra,* that a prima facie case of race discrimination had been established where there had been a long-continued failure to select colored citizens for service on grand juries in a county, 50 per cent of whose population, or approximately 7,000, were colored, of whom from 70 to 80 per cent were shown to be literate.   We thought, as we think here, that had there been evidence obtainable to contradict the inference to be drawn from this testimony, the State would not have refrained from introducing it, and that the evidence which was introduced sufficiently showed that there

were colored citizens of the county qualified and available for service on the grand jury.

A prisoner whose conviction is reversed by this Court need not go free if he is in fact guilty, for Texas may indict and try him again by the procedure which conforms to constitutional requirements. But no State is at liberty to impose upon one charged with crime a discrimination in its trial procedure which the Constitution, and an Act of Congress passed pursuant to the Constitution, alike forbid. Nor is this Court at liberty to grant or withhold the benefits of equal protection, which the Constitution commands for all, merely as we may deem the defendant innocent or guilty. *Tumey* v. *Ohio,* 273 U. S. 510, 535. It is the State's function, not ours, to assess the evidence against a defendant. But it is our duty as well as the State's to see to it that throughout the procedure for bringing him to justice he shall enjoy the protection which the Constitution guarantees. Where, as in this case, timely objection has laid bare a discrimination in the selection of grand jurors, the conviction cannot stand, because the Constitution prohibits the procedure by which it was obtained. Equal protection of the laws is something more than an abstract right. It is a command which the State must respect, the benefits of which every person may demand. Not the least merit of our constitutional system is that its safeguards extend to all—the least deserving as well as the most virtuous.

*Reversed.*