[Crim. No. 13827. First Dist., Div. Two. Jan. 30, 1976.]

THE PEOPLE, Plaintiff and Appellant, v.
BEATRICE NAVARETTE, Defendant and Respondent.

[Civ. No. 35767. First Dist., Div. Two. Jan. 30, 1976.]

JOE VALENZUELA PERAZA, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA
COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Appellant and for Real Party in Interest.

Michael Stepanian, Steffan Imhoff, Ronald W. Rose, Glenn, Rose & Vertner and Ruth Astle for Defendant and Respondent and for Petitioner.

No appearance for Respondent.

---

OPINION

**ROUSE, J.**—On January 29, 1974, an indictment was filed in the Santa Clara County Superior Court charging defendants Beatrice Navarette and Joe Peraza with selling heroin and offering to sell marijuana, in violation of sections 11352 and 11360 of the Health and Safety Code. Both defendants moved to quash the indictment on the ground of discriminatory grand jury selection.

A hearing on the motion was held on August 19 and September 5, 1974, and the following evidence was produced: Between 1969 and 1973, the Santa Clara County Superior Court judges nominated 25 to 30 persons each year to serve on the grand jury. The populations of the county supervisorial districts were reflected in the nominations, so that six jurors were nominated from each of the five supervisorial districts. Each year, the names of 19 grand jurors were drawn by lot from the judges' nominees.

Data furnished by the assistant court executive officer showed that the grand jury nominees in the years 1969 through 1973 were as follows: in 1969, 2 women and 27 men; in 1970, 2 women and 28 men; in 1971, 4 women and 26 men; in 1972, 6 women and 24 men; and in 1973, 2 women and 27 men. Of these 148 nominees, 16 or 10.8 percent were women. The 1970 Census showed that 51.7 percent of Santa Clara County residents were female. The defense called an expert in the area of methodology and statistics who testified that the proportion of female nominees could not be attributed to chance.

After receiving this evidence, the trial court ruled that the defense had made a prima facie showing that women were underrepresented on the Santa Clara County Grand Jury and that the burden had shifted to the prosecution to justify such underrepresentation.

The prosecution then called as witnesses 7 of the 24 superior court judges who had participated in the nomination of grand jurors. Judge McInerny testified that he nominated three women and two men to the grand jury between 1969 and 1973. Grand jury rule A-3-B, which set forth guidelines to be followed in the nomination of grand jurors, recommended "that the selection includes both men and women and is generally representative of the occupational, nationality, racial, social and economic groups within the county." Judge McInerny recalled that these rules were discussed by the judges making the nominations. Judge McInerny was personally acquainted with the three women and two men he nominated to the grand jury. None of the three women nominated by Judge McInerny were bothered by the fact that meetings of the grand jury would be held late at night or in the early morning hours.

Judge Gallagher made five nominations to the grand jury between 1969 and 1973. All of his nominations were male. He felt that it was "coincidental" that his nominations were all male, and he stated that he saw no reason why women were not qualified to serve on the grand jury. Judge Gallagher was aware that other judges were nominating women and was therefore satisfied that this area of representation was being covered.

Judge Allen nominated two women and three men to the grand jury between 1969 and 1973. He was personally acquainted with all of his nominees. Judge Allen testified that in 1974, the judges made a greater effort than in prior years to see that women and racial minorities were represented on the grand jury. Concern had arisen among the judges because in 1973, the draw had resulted in an all male grand jury.

Judge Evans nominated seven men and one woman to the grand jury between 1969 and 1973. He testified that there was talk among the judges of a need for more women nominees, and he stated that he himself had attempted to find women candidates. Judge Evans had found that some women were unwilling to serve on the grand jury because of the late hours involved and the necessity of returning home alone after midnight. There were also fewer women than men who possessed the professional or governmental experience which was considered desirable in a grand

juror. Judge Evans felt that housewives lacking experience with local government would have a difficult time making any kind of intelligent criticism of the manner in which the county government was being run.

Judge Rhodes' five nominations to the grand jury were all males. He testified that his practice was to nominate individuals whom he had known previously and who had come to him and expressed an interest in serving on the grand jury. Judge Rhodes had never made any attempt, through women's organizations or otherwise, to locate women in the community who would be qualified to serve on the grand jury. He had never considered nominating women to the grand jury and had not thought about it one way or the other.

Judge Longinotti nominated five men to the grand jury between 1969 and 1973. Four of his nominations were personal acquaintances. Judge Longinotti never actively attempted to locate women in the community who would be qualified for grand jury duty. He had talked with various women whom he considered potential candidates, but none of them had agreed to serve. The usual response of the women was that they had children to care for and were concerned for their own safety in view of the late hours required.

Judge Hall made 10 nominations to the grand jury between 1969 and 1973. He could not recall if any of his nominees were women. Judge Hall felt that it was difficult to find women willing to serve on the grand jury because the great amount of time involved interfered with their responsibilities in the home and because the late hours posed a security problem. He stated that in 1972, he had found it necessary to have three patrol cars available to drive the four female grand jurors to their homes at the end of late sessions.

The trial court took judicial notice of the fact that in 1974, 19 women and 11 men were nominated to the grand jury.

In addition to contending that women were systematically excluded from the Santa Clara County Grand Jury, the defendants also sought to establish that "blue collar" workers were systematically excluded from said body. Defendants made an offer of proof to that effect and produced the affidavit of a sociologist, Robert Blauner, to the effect that "blue collar" workers were a distinct social class with social and political outlooks which differed significantly from other members of the population. Defense counsel offered to call Blauner as a witness to so testify,

and he also asked the court to allow the defense to gather the necessary economic data concerning the members of the grand jury by question-naire or survey. The trial court ruled that "blue collar" workers were not an identifiable class entitled to proportional representation on the grand jury.

At the conclusion of the evidentiary hearing, the trial court rendered a decision in which it determined that, although there was no deliberate and intentional exclusion of women from the grand jury, there was a "statistical discriminatory result" in that women were substantially underrepresented on the Santa Clara County Grand Jury. The court concluded that the absence of "discriminatory design" was not the determinative factor, stating, "The consequence however is the same, since the thrust of a tenable constitutional challenge is directed to a substantial under-representation of a cognizable class over a substantial period of time by a member of that class."

Since defendant Navarette was a woman and a member of the class underrepresented on the grand jury, the court granted her motion to quash the indictment. However, since defendant Peraza was not a member of such class, the court held that he had failed to show any bias to him from the underrepresentation of women on the grand jury. Therefore, the court denied his motion to quash the indictment.

The People have appealed from the order quashing the indictment against defendant Navarette. Defendant Peraza has filed in this court a petition for a writ of prohibition ordering that no further action be taken on the criminal charges against him other than to quash the indictment against him. The alternative writ has now been issued by this court, and the writ proceedings have been consolidated for hearing with the appeal by the People from the order in favor of defendant Navarette.

We turn first to the People's appeal from the order quashing the indictment against defendant Navarette. The Attorney General asserts that there was ample evidentiary support for the trial court's determina-tion that the underrepresentation of women on the Santa Clara County Grand Jury was not the result of the deliberate and intentional exclusion of women from the grand jury. He argues that, in the absence of purposeful discrimination, the court was not entitled to quash the indictment merely because women were substantially underrepresented on the grand jury. The Attorney General contends that the "purposeful discrimination" standard is still the controlling standard applied by the

courts, although they concede that dicta in a recent California case (*People* v. *Superior Court (Dean)* (1974) 38 Cal.App.3d 966, 971-972 [113 Cal.Rptr. 732), suggests the existence of an affirmative duty on the part of the compilers of jury lists to develop procedures designed to achieve a fair cross-section of the community. While the People do not concede that the language of the *Dean* case is representative of the present state of the law, they argue that, in any event, the instant case should be decided in terms of the law as it existed when the Santa Clara County Superior Court judges nominated the 1973 grand jurors. They contend that, at that time, the law was unclear as to whether women were an identifiable group entitled to proportional jury representation and that the judges nominating persons to the grand jury therefore were required to refrain from deliberately excluding women.

Defendant Navarette takes a contrary position. She asserts that once the defense produced statistical evidence that women were severely underrepresented on the grand jury, the burden shifted to the prosecution to establish that there had been no purposeful discrimination. Defendant contends that because the prosecution called as witnesses only 7 of the 24 judges who had participated in the nomination of grand jurors, the prosecution did not meet its burden of proof and overcome the prima facie showing made by the defense because it might well be that the 17 judges who did not testify had all intentionally and arbitrarily refused to nominate women to the grand jury.

Defendant also disagrees with the Attorney General's contention that the law was unclear, at the time of the nomination of the 1973 grand jury, as to the status of women as an identifiable group entitled to representation on the grand jury. Defendant contends that they were an identifiable group entitled to such representation at that time, and, further, that the judges making the grand jury nominations had an affirmative duty to utilize selection procedures designed to assure the proportional representation of women on the grand jury.

The argument most readily disposed of is defendant's claim that the prosecution failed to meet its burden of proof because it did not call as witnesses all 24 of the judges who participated in the selection of grand jurors. The record reveals that after the seven judges called by the prosecution had completed their testimony, it was agreed by the court, the prosecutor and both defense counsel that it would serve no useful purpose to call any other judges as witnesses because their testimony would merely be cumulative of the testimony already received. Clearly,

counsel for defendant Navarette is now precluded from taking the contrary position and asserting that the testimony given by the 7 judges was not fairly representative of that which would have been given by the ·17 who were not called as witnesses.

■ Once it be assumed that the 7 judges who did testify were, in effect, speaking for all 24 judges who participated in the nomination of grand jurors, it becomes apparent that their testimony does furnish sufficient evidentiary support for the court's finding that there was no deliberate or intentional exclusion of women from the grand jury during the years in question. None of the judges considered women, per se, as unqualified to serve on the grand jury, and none of them intentionally chose not to nominate women. Three of the seven judges had in fact nominated women to the grand jury, and the testimony suggests that the primary reason why more women were not nominated was that there were far fewer women than men in the community who were willing to serve on the grand jury and who possessed the qualifications considered desirable in grand jurors. While such evidence does suggest some perplexity on the part of Santa Clara County trial judges in their efforts to determine how best to persuade women to serve, we conclude, nevertheless, that the trial court must be upheld in its conclusion that there was no intentional or purposeful exclusion of women from the grand jury.

The other questions with which we must concern ourselves are whether the judges nominating the 1973 grand jury had an affirmative duty to utilize a selection procedure designed to achieve the proportional representation of women on that body, and, if so, whether the evidence established that they failed to fulfill this duty.

We address the latter question first and conclude that the proportional representation of women on the 1973 grand jury could have been achieved had the judges made a more active attempt to locate within the community women who were qualified to serve as grand jurors and who were willing to do so. During the years 1969 through 1973, only 10.8 percent of the grand jury nominees were women, although women constituted a majority of the residents of Santa Clara County. Women constituted slightly less than 7 percent of the 1973 grand jury nominees. Yet, when the judges nominated the 1974 grand jury and made a more active attempt to find qualified women candidates, they apparently had no difficulty in doing so and nominated 19 women and 11 men. The conclusion is unavoidable that the underrepresentation of women on the

grand jury during the years 1969 through 1973 could have been obviated had similar affirmative action been taken by the judges making the nominations. The Attorney General apparently concedes this to be the case, by pointing out that when the law became "clear" as to the status of women as an identifiable group entitled to jury representation, the Santa Clara County Superior Court judges "acknowledged as much in their 1974 grand jury nominations, a majority of which are women."

█ Finally, we consider the question of whether a lack of affirmative action on the part of the judges nominating the 1973 grand jury compels the quashing of the indictment against defendant Navarette.

The recent case of *People* v. *Superior Court (Dean), supra,* at pages 971-972, contains a thorough and well reasoned analysis of the law on the subject of purposeful discrimination. There, the court pointed out that "The decisions requiring the accused to show systematic, purposeful discrimination do not square with others which condemn discrimination stemming from negligence or inertia. The latter recognize that official compilers of jury lists may drift into discrimination by not taking affirmative action to prevent it. In formulating a panel for a grand jury endowed with the criminal indictment function, officials must adhere to a standard more stringent than mere abstention from intentional discrimination; they have an affirmative duty to develop and pursue procedures aimed at achieving a fair cross-section of the community.

"As a consequence, constitutional attack on grand jury composition may be supported by statistics which demonstrate discriminatory result rather than discriminatory design."

In this instance, the statistical evidence produced by the defense established a consistently discriminatory result over a period of years insofar as women were invariably underrepresented on the Santa Clara County Grand Jury.The prosecution attempted to rebut this showing by establishing that the judges who participated in the nomination of grand jurors were not motivated by any intent to discriminate against women. However, the trial court held that the absence of "discriminatory design" was not the determinative factor. The trial court's holding is sound and in accord, not only with the reasoning of the *Dean* case, but with a recent mandate of the United States Supreme Court as set forth in *Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692]. In *Taylor,* the court stated: "We are also persuaded that the fair-cross-section requirement is violated by the systematic exclusion of women, who in the

judicial district involved here amounted to 53% of the citizens eligible for jury service. This conclusion necessarily entails the judgment that women are sufficiently numerous and distinct from men and that if they are systematically eliminated from jury panels, the Sixth Amendment's fair-cross-section requirement cannot be satisfied."[1] (P. 531 [42 L.Ed.2d at p. 698].)

While it appears undebatable that under the precepts laid down in *Dean* and *Taylor* the indictment in question should be invalidated due to gross underrepresentation of women in the 1973 and the preceding grand jury panels, the issue still awaiting determination is whether *Dean* and *Taylor* should be given retroactive effect so as to be controlling with regard to the case at bench or be applied prospectively only to instances where the grand jury was selected after rendition of those cases. We believe there are weighty considerations why the principles enunciated in *Dean* and *Taylor* must be restricted to future cases only and may not properly be vested with a retroactive effect.

First, it bears emphasis that at the time of the selection of the grand jury at bench, the case law uniformly held that the grand jury selection process was subject to constitutional challenge only if the defendant sustained the burden of proving that there was a purposeful and intentional discrimination which resulted in a systematic exclusion of a cognizable or identifiable group or class of qualified citizens from the jury. (*Whitus* v. *Georgia* (1967) 385 U.S. 545, 550 [17 L.Ed.2d 599, 603-604, 87 S.Ct. 643]; *Swain* v. *Alabama* (1965) 380 U.S. 202, 205 [13 L.Ed.2d 759, 764, 85 S.Ct. 824]; *Hernandez* v. *Texas* (1954) 347 U.S. 475, 476-478 [98 L.Ed. 866, 869-870, 74 S.Ct. 667]; *People* v. *White* (1954) 43 Cal.2d 740, 749-750 [278 P.2d 9]; *In re Wells* (1971) 20 Cal.App.3d 640, 649 [98 Cal.Rptr. 1]; *People* v. *Nero* (1971) 19 Cal.App.3d 904, 910 [97 Cal.Rptr. 145].) As noted earlier, the instant record fails to support the contention that the exclusion of women from the grand jury was either purposeful or intentional.

Second, while it is conceded that cases preceding *Dean* occasionally pointed out that the existence of purposeful and intentional discrimina-

---

[1] We feel that the Attorney General's valiant efforts to distinguish the instant situation from that of *Taylor, supra,* and other federal cases, on the basis of the functions performed by federal and state grand juries versus those performed by petit juries, are futile since it appears that, on the question of cross-section representation, the United States Supreme Court is not inclined to recognize such distinctions. (In that connection, note *People v. Newton* (1970) 8 Cal.App.3d 359, 388 [87 Cal.Rptr. 394]; *People v. Pinell* (1974) 43 Cal.App.3d 627, 631-632, fn. 1 [117 Cal.Rptr. 913].)

tion may be deduced from a substantial history of gross underrepresentation of an identifiable class, we observe that the cases voicing such view involved discriminatory practices based on race or color (*Hernandez* v. *Texas, supra; Cassell* v. *Texas* (1950) 339 U.S. 282 [94 L.Ed. 839, 70 S.Ct. 629]; *Akins* v. *Texas* (1945) 325 U.S. 398 [89 L.Ed. 1692, 65 S.Ct. 1276]; *Hill* v. *Texas* (1942) 316 U.S. 400 [86 L.Ed. 1559, 62 S.Ct. 1159]; *Smith* v. *Texas* (1940) 311 U.S. 128 [85 L.Ed. 84, 61 S.Ct. 164]), and in no way govern the instant case (cf. *Hoyt* v. *Florida* (1961) 368 U.S. 57, 68 [7 L.Ed.2d 118, 125-126, 82 S.Ct. 159].)

Third, the Supreme Court in *Taylor* underlined that "until today [i.e., January 21, 1975] no case had squarely held that the exclusion of women from jury venires deprives a criminal defendant of his Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community." (*Taylor* v. *Louisiana, supra,* at pp. 535-536 [42 L.Ed.2d at p. 701].) Prior to Taylor, the prevailing law was outlined in *Hoyt* v. *Florida, supra,* where the Supreme Court upheld the constitutionality of a Florida statute which, in line with longstanding federal and state practice, did not require women to serve as jurors except on a voluntary basis, and which, similar to the case at bench, resulted in gross de facto underrepresentation of women on the grand jury.

Fourth, the question of the retroactive or prospective application of *Taylor* was addressed and decided in *Daniel* v. *Louisiana* (1975) 420 U.S. 31 [42 L.Ed.2d 790, 95 S.Ct. 704]. Weighing the relevant factors set out in the cases, namely, (a) the purpose to be served by the new standards; (b) the extent of the reliance by the law enforcement authorities on the old standards; and (c) the effect on the administration of justice of a retroactive application of the new standards (*Stovall* v. *Denno* (1967) 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967]; *DeStefano* v. *Woods* (1968) 392 U.S. 631, 633 [20 L.Ed.2d 1308, 1311, 88 S.Ct. 2093]), the court held that *Taylor* is not to be applied retroactively, as a matter of federal law, to convictions obtained by juries impaneled prior to the date of that decision. (*Daniel* v. *Louisiana, supra,* at pp. 32-33 [42 L.Ed.2d at pp. 792-794].)

We entertain no doubt that, when applied to the facts of the case at bench, the factors stated before equally justify, if not mandate, the prospective application of both *Dean* and *Taylor.* Of the criteria spelled out above, we place special emphasis on the significant circumstance that in the instant case the judges were fully warranted in relying on the law prevailing in the years 1969 through 1973 which, while prohibiting an

outright and purposeful discrimination in the grand jury selection, failed to specify that an unintentional de facto discrimination likewise falls within the protective umbrella of the Fourteenth Amendment and vitiates the indictment of a grand jury so selected on due process and equal protection grounds. Thus, it is reasonable to conclude that, in like manner, *Taylor* is not to be applied retroactively in this instance to an indictment obtained by a grand jury which was empaneled prior to the effective date of that decision.

■ In the case of defendant Peraza's application for a writ of prohibition, the same rules hold true. His primary contention is that the trial court erred in holding that, because he was a male, he had no standing to complain of the underrepresentation of women on the Santa Clara County Grand Jury. The validity of this contention was established in *Taylor* v. *Louisiana, supra,* where the court held that a male defendant had standing to object to the exclusion of women from his jury. In so holding, the court stated, ". . . Taylor's claim is that he was constitutionally entitled to a jury drawn from a venire constituting a fair cross section of the community and that the jury that tried him was not such a jury by reason of the exclusion of women. Taylor was not a member of the excluded class; but there is no rule that claims such as Taylor presents may be made only by those defendants who are members of the group excluded from jury service. In *Peters* v. *Kiff,* 407 U.S. 493 (1972), the defendant, a white man, challenged his conviction on the ground that Negroes had been systematically excluded from jury service. Six members of the court agreed that petitioner was entitled to present the issue and concluded that he had been deprived of his federal rights. Taylor, in the case before us, was similarly entitled to tender and have adjudicated the claim that the exclusion of women from jury service deprived him of the kind of factfinder to which he was constitutionally entitled." (P. 526 [42 L.Ed.2d at pp. 695-696].)

While, prior to *Taylor,* there may have existed doubt in the minds of some concerning the right of a male defendant to raise the question of adequate female representation on a jury of his own selection, the United States Supreme Court has now dealt squarely with that issue. Later, *Daniel* v. *Louisiana, supra,* dealt with the retroactive application of the rule enunciated in *Taylor.* We conclude, therefore, that, in the instant case, the trial court erred in determining that, because he was a male, Peraza was precluded from challenging the grand jury on the ground that women were underrepresented thereon. However, for reasons hereinbefore set forth, we hold that *Taylor* and *Daniel* preclude retroactive application of the rule to defendant Peraza's case.

Defendant Peraza also contends that the trial court erred in ruling that "blue collar" workers were not an identifiable class entitled to proportional representation on the grand jury. In support of his position, defendant made an offer of proof in the trial court to show the division between "blue collar" working class people, who work with their hands, utilizing tools and machines, and "white collar" and professional people, who work with paper, with symbols, or with people.

In considering the standards for selection of jurors, the Report of the United States Judicial Conference on the Operation of the Jury System (hereinafter Judicial Conference Committee Report) quoted with approval the 1942 Knox Report: " 'The Constitution, together with statutes and decisions, make it evident that anything that amounts to a conscious and deliberate exclusion from jury lists of representatives of any class of persons solely on account of race, color, economic, or social status is improper and may be unlawful.' " (Judicial Conference Com. Rep. (1960) 26 F.R.D. 409, 426-427.)

Defendant relies on *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217 [90 L.Ed. 1181, 66 S.Ct. 984, 166 A.L.R. 1412], wherein it was held that daily wage earners constituted an identifiable class, entitled to proportional representation. The Judicial Conference Committee Report viewed this case as dealing with economic discrimination. (P. 429.)

If defendant is attempting to construct a class of the poor or of persons with low incomes, the designation "blue collar workers" is too imprecise and overinclusive. It is common knowledge that many workers in craft occupations earn high incomes, well in excess of incomes earned by certain so-called "white collar workers." Alternatively, defendant may be trying to create a class of workers who hold a unique social status as a result of their employment. However, the characteristics of such a class are vague and ambiguous. If "blue collar workers," as defined by defendant, work with their hands, utilizing tools and machines, and "white collar" and professional people work with paper, symbols and people, in which category would an artist or draftsman fall? The defendant himself is a barber, working simultaneously with tools and people. Defendant's own expert sociologist admits there are specific occupations which are ambiguous and borderline.

Accordingly, we find the designation "blue collar workers" does not constitute a distinctly identifiable group in the community.

The order quashing the indictment against defendant Navarette is vacated and set aside with directions to reinstate criminal proceedings therein. Defendant Peraza's petition for a writ of prohibition is denied. The alternative writ of prohibition heretofore granted is discharged.

Taylor, P. J., and Kane, J., concurred.

A petition for a rehearing was denied February 27, 1976, and the petition of the defendant and respondent and the petitioner for a hearing by the Supreme Court was denied March 24, 1976.