Linda ANAYA, Petitioner, Appellant,

v.

Edward J. HANSEN, Superintendent,
Maine Correctional Center, et al.,
Respondents, Appellees.

No. 84–1625.

United States Court of Appeals,
First Circuit.

Argued May 9, 1985.

Decided Jan. 9, 1986.

Ralph W. Brown, Portland, Me., for appellant.

Nicholas M. Gess, Asst. Atty. Gen., with whom James E. Tierney, Atty. Gen., Augusta, Me., Eric E. Wright, Brunswick, Me., and Charles K. Leadbetter, Asst. Atty. Gen., Criminal Div., Appellate Section, Augusta, Me., were on brief for appellees.

Before CAMPBELL, Chief Judge, VAN DUSEN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

This is an appeal from the denial of the habeas corpus petition of Linda Anaya. The primary question raised is whether blue collar workers, less educated individuals, and young adults constitute "cognizable" or "distinctive" groups under the test set forth by the Supreme Court in *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), such that a mere showing of statistical underrepresentation of such persons on the venire in comparison to their representation in the community as a whole will indicate a prima facie violation of the sixth amendment. We hold that, under the principles set forth by this circuit in *Barber v. Ponte*, 772 F.2d 982 (1985) (en banc), it would be inappropriate to take judicial notice that any of these groups are "cognizable" for *Duren* purposes. Therefore, we affirm.

## I. FACTS

Shortly after midnight on April 9, 1980, police in Cumberland County, Maine, responded to a report of a stabbing in the apartment of petitioner Linda Anaya. When they arrived at the scene, the police found Anaya stroking the head of her boyfriend, Frank Williams, as he lay dying of a knife wound to the back.

A Cumberland County grand jury subsequently returned an indictment charging Anaya with the murder of Williams. Because Anaya was indigent, counsel was appointed for her. Before trial, Anaya moved to dismiss the indictment on the ground that the grand and petit juries were drawn from a pool that did not fairly represent a cross section of her community, and moved for the appointment of experts to study, at public expense, the juror selection process in Cumberland County. Both motions were denied.

Anaya was convicted of manslaughter after trial before a Cumberland County

jury. On appeal, however, the Maine Supreme Court reversed her conviction, due to the failure of the trial judge to permit a psychologist and a medical doctor to testify about the "battered wife syndrome." *State v. Anaya*, 438 A.2d 892 (Me.1981).

Before her second trial, Anaya successfully moved in the Maine Superior Court for the appointment of a sociologist as an expert witness to examine the nature of the grand and petit jury pools in Cumberland County and for "reasonable compensation" for the witness. She also successfully moved for copies of questionnaires that had been sent out and returned by members of the 1980–81 and 1981–82 Cumberland County jury pools. Approximately nine weeks later, and less than two weeks before the date set for her second trial, Anaya moved for appointment of an expert statistician to help the sociologist analyze the composition of Cumberland County jury pools and for more than $30,000 for expert analysis of the pools. The superior court granted her $500 to pursue this analysis.

On the day petitioner was arraigned and scheduled to begin trial, defense counsel asked the court to continue the trial until a "new and properly constituted" jury pool could be drawn from which petitioner's jury could be selected. Anaya then attempted to show that Cumberland County's juror selection system produced jury pools that failed to contain a cross section of the community from which they were drawn because persons aged 18–24, blue collar workers, and persons with less than a high school education were significantly underrepresented in recent county jury pools. The superior court denied the jury pool challenge.

Anaya was then convicted of manslaughter. She again appealed to the Maine Supreme Court, this time emphasizing her jury pool challenge and appealing the superior court's denial of additional funds with which to study the composition of the Cumberland County jury pools. The Maine Su-

* Of the Third Circuit, sitting by designation.

preme Court found that Anaya had not made the requisite factual showing that young adults between the ages of 18 and 24, blue collar workers, or less educated persons constituted cognizable classes within her community and therefore denied her sixth amendment challenge. The Maine Supreme Court also denied Anaya's appeal for additional funds to pursue her jury pool challenge on the ground that Anaya did not show that failure to award the funds significantly prejudiced her. *State v. Anaya*, 456 A.2d 1255 (Me.1983).

Having exhausted her state remedies, Anaya sought a writ of habeas corpus from the United States District Court for the District of Maine. The district court dismissed the petition and denied a certificate of probable cause. We granted a certificate of probable cause to allow Anaya to appeal from the decision of the district court.

## II. THE FAIR CROSS–SECTION REQUIREMENT

The sixth amendment to the United States Constitution guarantees a criminal defendant a trial "by an impartial jury of the State and district wherein the crime shall have been committed."[1] The amendment has been interpreted to guarantee a criminal defendant a jury "drawn from a source fairly representative of the community.", *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975). In order to establish a prima facie violation of this "fair cross-section" requirement, a petitioner must show (1) that the group alleged to be excluded is a "cog-

nizable" or "distinctive" group within the community;[2] (2) that the representation of this group is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is inherent in the system used to select the jury pools or venires. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). There is no requirement that the defendant be a member of the "distinctive" group allegedly excluded from the venires. *Taylor*, 419 U.S. at 526, 95 S.Ct. at 695.

Anaya alleges that three cognizable groups have been systematically underrepresented in Cumberland County jury pools: young persons aged 18–24; blue collar workers, and persons with less than a high school education.[3]

### A. Young Adults

The first of these claims falls as a result of our recent decision in *Barber v. Ponte*, 772 F.2d 982 (1st Cir.1985) (en banc). In that case, we held that "young adults" do not constitute a "cognizable group" so as to satisfy the first prong of the three-part *Duren* test. While in *Barber* "young adults" were described as persons between the ages of 18 and 34, our analysis there applies equally forcefully to the age range presented in the instant case.

### B. Blue Collar Workers

Petitioner contends that a 1946 Supreme Court decision, *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), requires a different re-

---

1. The sixth amendment has been held to be incorporated into the due process clause of the fourteenth amendment and therefore applies to state as well as federal criminal trials. *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968).

2. The terms "cognizable" group and "distinctive" group are used interchangeably.

3. Anaya produced evidence indicating that persons between the ages of 18 and 24 constituted 17.2 percent of Cumberland County's population, but only 8.5 percent of the county's jury pool members in 1980–81; blue collar workers

made up 41.9 percent of the county population but only 25.1 percent of jury pool members who could be identified as either blue collar or white collar; and persons with less than a high school education constituted 35.9 percent of the county population and 11.4 percent of the jury pools studied. All of the expert's demographic statistics for Cumberland County were taken from the 1970 census. His juror sample consisted of 1,228 members of the 1980–81 and 1981–82 jury pools who had returned survey questionnaires. Some individuals among the 1,228 respondents failed to supply all the requested information regarding age, education level, or occupation, and, therefore, could not be categorized.

**4**

sult regarding blue collar workers. We disagree.

*Thiel* was a negligence suit against a railroad. The injured plaintiff moved to strike the jury panel on the ground that "mostly business executives or those having the employer's viewpoint are purposely selected on said panel[.]" The district court denied his motion, and the Court of Appeals affirmed. The Supreme Court reversed, holding that systematic exclusion of daily wage earners from jury lists violated "the general principles underlying proper jury selection." The Court said:

> [T]he pay period of a particular individual is completely irrelevant to his eligibility and capacity to serve as a juror. Wage earners, including those who are paid by the day, constitute a very substantial portion of the community, a portion that cannot be intentionally and systematically excluded in whole or in part without doing violence to the democratic nature of the jury system. Were we to sanction an exclusion of this nature we would encourage whatever desires those responsible for the selection of the jury panels may have to discriminate against persons of low economic and social status. We would breathe life into any latent tendencies to establish the jury as the instrument of the economically and socially privileged. That we refuse to do.

*Id.,* 328 U.S. at 223–24, 66 S.Ct. at 987 (footnote omitted).

*Thiel* nevertheless cannot be read as mandating that blue collar workers are a "cognizable group" as that term was used in *Duren,* such that a mere showing of statistical underrepresentation, with little more, indicates a prima facie violation of the sixth amendment. In *Thiel,* there was uncontroverted evidence that wage earners were deliberately discriminated against; "[b]oth the clerk of the court and the jury commissioner testified that they *deliberately* and *intentionally* excluded from the jury lists all persons who work for a daily wage." *Thiel,* 328 U.S. at 221, 66 S.Ct. at 986 (emphasis added). The case did not

involve a mere showing that certain types of occupations were *statistically* underrepresented on the venire, the issue before us in the present case. The requirement that a jury be drawn from a cross section of the community, wrote the Court,

> does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographic groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without *systematic* and *intentional exclusion* of any of these groups.

*Thiel,* 328 U.S. at 220, 66 S.Ct. at 985 (emphasis added).

In *Barber v. Ponte,* 772 F.2d 982 (1st Cir.1985) (en banc), we distinguished between deliberate exclusion of jurors and a mere showing, prima facie, of a statistical imbalance. We stated that

> If certain people are specifically and systematically excluded from jury duty, then the jury-administrating authority would have created its own group. Clearly, the state has no right to deliberately exclude specific classes or groups from juries without some very special reason. Thus, it may not *forbid* blue collar workers, chess players, Masons, etc. from serving on juries. But if there are, as in the present case, mere statistical imbalances, unexplained, the problem is different.

*Id.* at 1000.

*Thiel* is exactly the type of case we adverted to in *Barber:* the jury-administrating authority "created its own group" by deliberately excluding all daily wage earners. There is absolutely no indication in *Thiel* that, absent the specific exclusionary practices, the Court would reach the same result upon a showing of mere statistical imbalance in jury venires. *Thiel,* of course, preceded *Duren* by over 30 years, having been written well before the *Duren* test, or even the *Hernandez* formulation, *infra,* had evolved.

Whether blue collar workers constitute a "distinct group" for purposes of a *Duren* analysis, therefore, is not an issue on which *Thiel* provides much relevant guidance. We must determine for ourselves whether blue collar workers are a cognizable group within that special context. On this record the answer must be "no," for two reasons. First, blue collar workers do not constitute a sufficiently coherent group so as to meet the definitional standards of distinctiveness set forth by this court in *Barber*. Second, even if they did meet these standards, it would remain the fact that blue collar workers are not among the small number of special groups that the Supreme Court has suggested require the special protection of courts in cases like the present one.

### 1. Lack of Coherence

In *Barber*, we set forth certain threshold standards for finding a group cognizable. We stated that, as an initial matter, we will require

(1) that the group be defined and limited by some clearly identifiable factor (for example, sex or race), (2) that a common thread or basic similarity in attitude, ideas, or experience run through the group, and (3) that there be a community of interest among the members of the group, such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process.

*Barber*, 772 F.2d at 997. These standards are to be applied strictly.[4]

Without specific evidence of their characteristics within a particular community, we do not believe we can take judicial notice that a group defined simply as "blue collar workers" meets even the first requirement.[5] Is the operator of a medium-sized farm blue collar or white collar? What about an on-site engineer at a construction project? A semipro baseball player? True, there are some workers who can be clearly identified as "blue collar," but at a certain point, the term fades into ambiguity.[6]

Even if it could be said that blue collar workers met the first requirement, how-

---

**4.** In *Barber*, for example, we suggested that "young adults" would not meet *any* of these three requirements because (1) there is no clear dividing line between those who are "young adults" and those who are not, and (2) even if we could meaningfully identify any such boundaries, there would necessarily remain "clear differences in the attitudes, values, ideas and experiences" among the members of such a group. *Barber*, 772 F.2d at 998–99.

**5.** As appellant admits in her brief before this court, the evidence presented to the court below regarding the distinctiveness of blue collar workers in Cumberland County, Maine, was "general in nature and weak." Since we therefore have essentially no evidentiary basis for the claim that blue collar workers are somehow a cognizable group, such a finding can only be based on judicial notice. *See* Fed.R.Evid. 201.

**6.** Webster's Third New International Dictionary defines "blue collar" merely as "belonging or relating to a broad class of wage earners whose duties call for the wearing of work clothes or protective clothing[.]" The fact that some people wear certain types of clothes to work, or have their paychecks based on an hourly or daily rather than monthly or yearly rate, hardly seems to "clearly identify" them in the way that sex or race does.

The methods used by appellant's expert to obtain statistics on the alleged underrepresenta-

tion of "blue collar workers" highlight the ambiguity inherent in that term. The expert testified that in order to obtain his figures from the varied individual responses on juror questionnaires, he was required to generalize quite broadly:

We coded occupations using standard census. In the sense that the census has substantive list of several thousand job titles, we were able to do that with considerable confidence. Those categories which consist really of three digit numbers can be reduced into essentially, I suppose, 9 or 10 categories, which are essentially professional, technical, managerial, sales, clerical, operative, craftsmen and kindred workers, laborers, and service workers. Those were then reduced ultimately to a general classification of white collar or blue collar.

A white collar category consists essentially of those persons involved in professional technical jobs—sales, clerical, and managerial occupations.

The blue collar category, those are laborers and who are crafts people, and who are operators.

We do not believe that a "group" identified in such a superficial manner—based entirely on the job titles provided on juror questionnaires—can, without more, be considered "cognizable."

ever, they would not meet the second two. There are vast differences among blue collar workers politically, socially, and even in the type of work they perform. Petitioner refers to "economic status," perhaps suggesting that this provides a "community of interest" among blue collar workers. But blue collar workers run the gamut from the ditch digger making minimum wage to the auto worker making $25 per hour or more, or the oil rigger with an annual income of $150,000. What is their economic "community of interest"? Economically, the ditch digger may have a greater community of interest with the receptionist or the computer data entry employee, white collar workers, than with the auto or steel worker in the 50 percent tax bracket. Even the appellant's own expert at trial would testify only that "on the average white collar workers are better compensated than blue collar workers."

### 2. Lack of Need for Special Protection

"Blue collar workers," therefore, is too loose a definitional term to describe a "cognizable" or "distinctive" group. Yet, even if the varied mixture of people subsumed under the label "blue collar" somehow *did* constitute a sufficiently coherent group, they would still fall outside those groups contemplated by the Supreme Court in *Duren*. As we observed in *Barber*, findings of cognizability have been limited to *special* groups, like women and blacks, that have been subjected to discrimination and prejudice within the community. *Barber*, 772 F.2d at 999. *See, e.g., Duren*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (women); *Hill v. Texas*, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942) (blacks); *United States v. Brady*, 579 F.2d 1121 (9th Cir. 1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979) (Native Americans).

The "distinctive group" requirement has its roots in *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), an equal protection case challenging the exclusion of Mexican-Americans from grand and petit juries. *See United States v. Test*, 550 F.2d 577, 585 n. 7 (10th Cir.1976). In *Hernandez*, the Supreme Court held that it is a denial of the equal protection of the laws to try a defendant before a jury from which members of his or her "distinct class" are excluded. The Court expressly defined—and limited—the term "distinct class" to mean a group that "required the aid of the courts" in securing protection from local prejudice or discrimination. *Hernandez*, 347 U.S. at 478, 74 S.Ct. at 670. *See also Castenada v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) ("The first step [in establishing an equal protection violation in the selection of a grand jury] is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment of the laws, as written or applied.").

When it decided *Duren* 25 years later, the Court, to be sure, did not state explicitly that there was any similar limitation on the definition of a "distinctive group" in the sixth amendment context. But *Duren* involved women, a group that not only is easily defined, but also has historically suffered from discrimination, and even now continues to fight a political and social struggle to achieve equality. Writing in such a clear-cut case, the Court may have simply found it unnecessary to go into the meaning of "cognizable group."

It seems only reasonable, however, that the Supreme Court did intend such a limitation. If the term "cognizable group" were taken to refer to *any* meaningful and identifiable classification of people, then jury venires would have to meet much higher standards of statistical correlation with the make-up of the community than has ever been thought necessary to meet constitutional standards in the past. This is the case because, so defined, there are literally thousands of "cognizable groups" extant: barbers, overweight persons, Red Sox fans, scoutmasters, Marine veterans, radio amateurs, and so on, ad infinitum. If cognizable group subsumes all these virtually limitless groups, any significant unexplained deviation from a perfect statistical mirroring of the society from which the jurors are drawn will be grounds for a constitutional

challenge, which if successful will result in the overturning of the conviction of a defendant who had received an entirely fair trial before a reasonably representative group of jurors.

There may be those who believe that juries should perfectly mirror the community. But surely there are *some* people—brain surgeons, for example—who may be better employed than serving as jurors. And there are others whose failure to serve on juries—for whatever non-exclusionary reason—can be tolerated without undermining the concept that juries should, in general, reflect the entire community.

To be sure, some states have recently experimented, commendably, with ways to broaden the juror base, such as the one-day, no-excuse jury system adopted in Massachusetts and a number of other states. These excellent measures, although coming after passage of the Federal Jury Selection and Service Act, 28 U.S.C. § 1861 (1968),[7] have been accomplished through local initiative. Both state and federal courts are under a continuing mandate to provide a "fair cross section" from which petit juries are to be drawn. But there is a difference between the optimal results which particularly well-administered jury plans, state or federal, can achieve, and the minimum which the Constitution requires. The cutting edge of reform should be left to uncoerced community initiatives. *Cf. New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).[8]

■ The Constitution precludes any demonstrated invidious exclusion of qualified persons from jury service, whatever group they come from. And, under *Duren*, it provides for establishment of a prima facie case of juror discrimination upon a showing of statistical underrepresentation of well-defined groups that history suggests may be discriminated against or excluded from the process. But while it is appropriate for courts to establish special protective rules for such groups, we doubt the wisdom of expanding such rules to myriad other groups (like blue collar workers) that historically have not required the special protection of courts.[9] Litigants with truly

---

7. The Jury Selection Act states that "[i]t is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. It further states that "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or ecomonic status." 28 U.S.C. § 1862. While the Act does not on its face apply to trials in state courts, the sixth amendment and these statutory standards have been construed as "functional equivalents." *United States v. Hafen*, 726 F.2d 21, 22 n. 1 (1st Cir.1984); *United States v. Test*, 550 F.2d 577, 584–85 (10th Cir.1976).

8. Even if we were to insist, as a constitutional requirement, that states devote the necessary amount of court and governmental time, money, and resources to the goal of further broadening the juror base so as to more perfectly mirror the community, it is questionable that we would observe much in the way of improved judicial results. Size prevents a given petit jury from ever mirroring the community; thus the Supreme Court has consistently held that the sixth amendment imposes "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975); *Fay v. New York*, 332 U.S. 261, 284, 67 S.Ct. 1613, 1625, 91 L.Ed. 2043 (1949); *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946). Most cases call for the kind of reasoned judgment that does not depend on the precise mix of jurors. The standard jury instruction tells jurors to put aside prejudices and sympathies in considering the evidence. When we, as an appellate court, ask what a "reasonable jury" might do, we have in mind a rational judgment based on a reasoned process, not on emotion or sympathy. Accordingly, while it is highly important that jury selection be free from discrimination, so that service be open to all, it is not absolutely critical that venires be a perfect statistical mirror of the entire population. All kinds of hard-to-perceive factors operate to prevent the achievement of this perfectionist goal. So long as most of the population participates, free from discrimination, the system will work in the manner intended.

9. Of course, as the *Hernandez* Court observed, the cognizability question is essentially one of fact to be determined within the particular com-

meritorious challenges to the venire will ordinarily be able to produce evidence of more than mere statistical anomalies in its makeup. If statistical imbalance alone is permitted as the touchstone—forcing the state in every instance to furnish a satisfactory explanation—we shall have to prepare for a marked increase in elaborate lawsuits seeking mistrials based on statistical abracadabra and inventive expert testimony.

Every court that has heretofore considered the issue has found that blue collar workers do *not* constitute a cognizable group. *See, e.g., United States v. Cabrera-Sarmiento,* 533 F.Supp. 799, 804, 807 (S.D.Fla.1982) (blue collar workers not cognizable); *United States v. Abell,* 552 F.Supp. 316, 324 (D.Me.1982) (cognizability of blue collar workers not shown); *United States v. Marcano,* 508 F.Supp. 462, 469 (D.P.R.1980) ("persons of the working class or of lower socioeconomic status" not cognizable); *Figueroa v. Commonwealth of Puerto Rico,* 463 F.Supp. 1212, 1214 (D.P.R.1979) ("the working classes [are] too ambiguous to support any finding of an identifiable class"); *Quadra v. Superior Court,* 378 F.Supp. 605, 621 (N.D.Cal.1974) ("low income blue collar workers" not cognizable); *People v. Estrada,* 93 Cal.App.3d 76, 93, 155 Cal.Rptr. 731, 741 (1979) (blue collar workers not cognizable); *People v. Navarette,* 54 Cal.App.3d 1064, 1077, 127 Cal. Rptr. 55, 63 (1976) (blue collar workers not cognizable).[10] For the reasons stated here, we join them today.

### C. *Less Educated Individuals*

█ Based on the above analysis, petitioner's argument that "less educated indi-

viduals" are cognizable under *Duren* also falls. This result finds widespread support in the case law. *See, e.g., United States v. Kleifgen,* 557 F.2d 1293, 1296 (9th Cir.1977) (less educated not cognizable); *United States v. Potter,* 552 F.2d 901, 905 (9th Cir.1977) (less educated not cognizable); *United States v. Cabrera-Sarmiento,* 533 F.Supp. 799, 804, 807 (S.D.Fla.1982) (persons with less than high school education not cognizable); *United States v. Abell,* 552 F.Supp. 316, 324 (D.Me.1982) (cognizability of less educated individuals within community not shown); *Figueroa v. Commonwealth of Puerto Rico,* 463 F.Supp. 1212, 1214 (D.P.R.1979) (less educated not cognizable).

Our own case, *United States v. Butera,* 420 F.2d 564 (1st Cir.1970), decided nine years prior to *Duren,* stands as a lonely exception to the otherwise unanimous rule that the less educated do not constitute a cognizable group. In *Barber,* we overruled that part of *Butera* that held young adults to be a cognizable group, and the continued validity of the rest of *Butera's* holding was left in doubt. We hold today that the aspect of *Butera* that suggests that less educated individuals are a cognizable group is also incompatible with *Barber,* and hence is no longer the law of this circuit.

### III. MOTION FOR ADDITIONAL FUNDS

█ Petitioner's final contention is that the denial by the state court of her motion for additional funds to pursue her jury pool challenge amounted to an unconstitutional

---

munity. *Hernandez,* 347 U.S. at 478–79, 74 S.Ct. at 670–71. Thus, it is conceivable, though perhaps only remotely, that blue collar workers could be shown to meet the standards of cognizability in a particular community. As noted in footnote 5, *supra,* there was nothing approaching such a showing in the instant case.

**10.** In *Barber* this court, sitting en banc, strongly suggested in dicta that it would not find blue collar workers to be cognizable. In rejecting the argument that "young adults" are a distinctive group, we warned that

if the age classification is adopted, surely *blue collar workers,* yuppies, Rotarians, Eagle Scouts, and an endless variety of other classifications will be entitled to similar treatment. These are not the groups that the court has traditionally sought to protect from underrepresentation on jury venires.

*Barber v. Ponte,* 772 F.2d at 999 (emphasis added). We added that, while a state plainly could not *"forbid* blue collar workers" from serving on juries, "the problem is different" if the claim is that there are "mere statistical imbalances, unexplained." *Id.* at 1000.

denial of resources necessary to adequately present her claim. The funds sought by petitioner were to be used for an analysis of the juror questionnaires and for surveys of those who had not returned questionnaires and members of earlier jury pools. These surveys, it appears, would have further refined petitioner's statistics regarding the alleged underrepresentation of certain groups in the jury venire.

Refining her statistics as to underrepresentation would not have helped Anaya, however. The first *Duren* requirement is the demarcation of a distinctive group. Since Anaya was unable to demonstrate that young adults, blue collar workers, or less educated persons are cognizable, her jury pool challenge would have failed regardless of the sophistication of her statistical showing of underrepresentation. Therefore, we cannot say that petitioner was prejudiced by the denial of her motion, and we refuse to hold that she was deprived of her constitutional right to an adequate defense.

*Affirmed.*

BOWNES, *Circuit Judge* (concurring).

Although I disagree with Chief Judge Campbell's interpretation of *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), and *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and would hold that *Thiel* requires a finding that Blue Collar workers are a cognizable group, I feel that until the Supreme Court has spoken further in this area that I am bound by the en banc opinion in *Barber v. Ponte* which was decided on September 18, 1985. I will not repeat the arguments I made in my dissent in *Barber*. There is, however, one point that must be reiterated. I simply do not understand why it should make any difference whether an identifiable community group is purposely excluded from the jury rolls or is excluded because of an inadequate jury selection process. The constitutional requirement that the jury represent a fair cross-section of the community has been violated, whether it be by accident or design. *See Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972.).