[Cite as *State v. Kirk*, 2019-Ohio-3887.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                             Nos. 107527 and 107553

    v. :

JOHN KIRK, ET AL. :

    Defendants-Appellants. :

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** September 26, 2019

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-17-624337-A and CR-17-624337-B

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Melissa Riley and Marcus A. Henry, Assistant Prosecuting Attorneys, *for appellee.*

Charles Ruiz-Bueno Co., L.P.A., and J. Charles Ruiz-Bueno, *for appellant* John Kirk.

Susan J. Moran, *for appellant* Frank Morris.

MARY EILEEN KILBANE, A.J.:

**{¶ 1}** In this consolidated appeal, defendants-appellants, John Kirk ("Kirk") and Frank Morris ("Morris"), appeal their convictions.[1] For the reasons set forth below, we reverse and remand.

**{¶ 2}** In December 2017, codefendants Kirk and Morris were charged in a nine-count indictment. Counts 1 and 2 charged Morris with rape. Counts 3 and 4 charged him with complicity, indicating that Morris aided or abetted Kirk in committing rape. Counts 5 and 6 charged Kirk with rape. Counts 7 and 8 charged Kirk with complicity, indicating that he aided or abetted Morris in committing rape.[2] Count 9 charged both Morris and Kirk with kidnapping.[3] J.C., the victim of these charges, had an intimate relationship with Morris at the time. The matter proceeded to a joint jury trial.

**{¶ 3}** During the voir dire process, defense counsel jointly requested a sidebar and made a *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), challenge. Both Kirk and Morris are African-American. Morris's defense counsel explained that the state had used four of seven peremptory challenges to excuse prospective African-American jurors. The trial court went through the

---

[1] Kirk's appeal in *State v. Kirk*, 8th Dist. Cuyahoga No. 107527, has been consolidated with Morris's appeal in *State v. Morris*, 8th Dist. Cuyahoga No. 107553, for disposition.

[2] The trial court dismissed Count 2 pursuant to Morris's Crim.R. 29 motion.

[3] Each of Counts 1-4 and 9 carried a sexually violent predator specification and Count 9 additionally carried a sexual motivation specification.

*Batson* challenge and did not find a *Batson* violation. Thereafter, the voir dire process concluded and the following facts were adduced at trial.

{¶ 4} On December 3, 2004, J.C. had friends and family at her house, including Morris and his cousin "Boo." J.C. did not know Boo's real name. Boo was later identified as Kirk. They were playing cards, drinking, and listening to music. J.C. did not frequently drink alcohol and began to feel intoxicated, so she went to lay down in her bedroom.

{¶ 5} J.C.'s memory of what happened next was sparse, but a video recording of the events sheds some light on what transpired. The video was played for the jury. It depicts Boo operating a video camera while talking to J.C., who was lying in bed. Boo asked her about making a sex tape with the "main attraction." J.C. eventually went into another room and woke up Morris, who was sleeping on the couch.

{¶ 6} Morris and Boo talked to J.C. about making a video. J.C. then engaged in fellatio with Morris. The video then stopped and started recording again with a possibly unconscious J.C. underneath Boo, who is naked. Morris was now recording the events. J.C. was unresponsive at this point of the video, and Boo flipped her over so he could continue vaginally penetrating her. Morris can be heard directing Boo to move J.C.'s body so that it will look good on the video. J.C. did not respond when Morris asked her to say something. The video then ends.

{¶ 7} J.C. testified that she remembers waking up to feeling pressure and realizing Boo was having sex with her. J.C. did not consent, nor did she want to have

sex with Boo and had no idea how he was on top of her. She testified that she had no recollection of what happened on the video other than waking up to Boo on top of her. She was upset that Boo was having sex with her and began to yell and fight with both Morris and Boo. The two men eventually left. J.C. then called her friend and the police.

{¶ 8} J.C. told the police what happened and identified Morris, but could only identify Kirk as Boo. J.C. also told police about the video recording, which was taken into evidence. She was transported to the hospital for a rape-kit examination.

{¶ 9} J.C. met with a Cleveland Police Department sex crimes detective and made a written statement. The detective had J.C. watch the video. J.C. was embarrassed by the video and ashamed that other people had watched it. On December 17, 2004, J.C. contacted the detective and completed a "do not prosecute letter" because she did not want anyone else to watch the video.

{¶ 10} J.C. further testified that Morris contacted her at that time and apologized about what happened. Morris refused to tell her Boo's real name. J.C. attempted to continue her relationship with Morris after the incident, but eventually ended it because she could not trust him.

{¶ 11} More than ten years later, J.C. came home one day to find a letter on her front door asking her to contact a member of the Cuyahoga County Prosecutor's Office. J.C. was informed that her rape case was being reinvestigated. She was shown a photo array in September 2015. At that time, J.C. selected Morris and wrote

"Frank Morris, exboyfriend" on the array. Then in September 2017, J.C. was shown another array. This time she identified Kirk as Boo.

{¶ 12} After the conclusion of trial, the jury found Kirk guilty of two counts of rape and one count of kidnapping, without the sexual motivation specification. The jury found Morris not guilty of rape as charged in Count 1 and guilty of two counts of complicity to rape and one count of kidnapping without the sexual motivation specification. At sentencing, the state agreed that all of the counts merged for sentencing purposes and elected to proceed to sentencing on Count 6 (rape) for Kirk and Count 4 (complicity to commit rape) for Morris. The trial court sentenced both Kirk and Morris to eight years in prison and classified each of them as a sexual predator.

{¶ 13} Kirk and Morris each appeal, raising the following assignments of error for review:

<u>Assignment of Error No. 1 — Kirk</u>

The trial court erred when it allowed the State to use its peremptory challenges in a racially discriminatory fashion.

<u>Assignment of Error No. 2 — Kirk</u>

The trial court committed prejudicial error by not allowing [Kirk] to re-cross the State's Witness after re-direct examination.

<u>Assignment of Error No. 1 — Morris</u>

The trial court deprived [Morris] of his due process right of confrontation when the court prevented [Morris] from engaging in re-cross examination.

## Assignment of Error No. 2 — Morris

The trial court erred in entering a judgment of conviction for two counts of complicity to rape, and one count of kidnapping as they were against the manifest weight of the evidence, in violation of [Morris's] right to due process of law, as protected by the fourteenth amendment to the United States Constitution.

## Assignment of Error No. 3 — Morris

The trial court denied [Morris] due process and a fair trial due to judicial bias.

## Assignment of Error No. 4 — Morris

The trial court erred in finding [Morris] to be a sexual predator.

{¶ 14}  Initially, we note that after appellate oral argument, both the state of Ohio and Morris were asked to submit supplemental briefing on the voir dire of the jury in light of Kirk's *Batson* challenge.  Morris presents the following supplemental assignment of error:

## Supplemental Assignment of Error — Morris

The trial court erred to the prejudice of [Morris] by overruling his objections to the state's use of its peremptory challenges to exclude racial minorities by excusing African-American members of the venire panel, in violation of *Batson v. Kentucky* and the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

{¶ 15}  We will address Kirk's first assignment of error and Morris's supplemental assignment of error first because they are dispositive.

{¶ 16}  Kirk and Morris argue that the state failed to present racially neutral reasons for excluding at least three prospective African-American jurors, who each expressed their ability to be fair and impartial.  Morris additionally argues that the

trial court did not contextually determine that there was a pattern of racially motivated challenges and removals of the prospective African-American jurors.

<u>Jury Selection and *Batson*</u>

{¶ 17} In *Batson*, the United States Supreme Court recognized that the Equal Protection Clause of the United States Constitution prohibits the use of peremptory challenges in a discriminatory manner to exclude potential jurors solely on account of their race. *Id.,* 476 U.S. at 89, 106 S.Ct. 1712, 90 L.Ed.2d 69; *see also State v. Hernandez*, 63 Ohio St.3d 577, 581, 589 N.E.2d 1310 (1992).

{¶ 18} There are three steps involved in adjudicating a *Batson* claim. As the Ohio Supreme Court in *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, stated:

> First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. *Batson*, 476 U.S. at 96-98, 106 S.Ct. 1712, 90 L.Ed.2d 69. However, the "explanation need not rise to the level justifying exercise of a challenge for cause." *Id.* at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69. Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination. *Id.* at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69. *See, also, Purkett v. Elem* (1995), 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834.

*Id.* at ¶ 106.

{¶ 19} We note that a trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous. *Hernandez* at 583, citing *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

{¶ 20} With the prima facie step, the trial court must "consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present." *Batson* at 96-97. One way a criminal defendant may make a prima facie case is by demonstrating that "'the totality of the relevant facts' about a prosecutor's conduct during the defendant's own trial" allows for an inference of discrimination. *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), quoting *Batson* at 94.

{¶ 21} At the second step of the inquiry, the issue is the facial validity of the prosecutor's explanation. "'Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging * * * jurors' within an arguably targeted class.'" *Miller-El* at 239, quoting *Batson*, 476 U.S. at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69. "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769, 131 L.Ed.2d 834, quoting *Hernandez v. New York*, 500 U.S. at 360, 111 S.Ct. 1859, 114 L.Ed.2d 395; *see also State v. Gowdy*, 88 Ohio St.3d 387, 392, 2000-Ohio-355, 727 N.E.2d 579.

{¶ 22} "In step three, the trial court may not simply accept a proffered race-neutral reason at face value, but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 65. "'The rule in *Batson* provides an

opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it.'" *Id.*, quoting *Miller-El* at 251-252. The juror may not be excluded if the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge. *Id.*, citing *Miller-El*.

{¶ 23} While the adoption of the *Batson* framework made it easier for a criminal defendant to challenge a prosecutor's exercise of a peremptory strike than it had been under the court's prior case law, the framework "came with a weakness of its own owing to its very emphasis on the particular reasons a prosecutor might give." *Miller-El*, 545 U.S. at 239-240, 125 S.Ct. 2317, 162 L.Ed.2d 196. That is because some of the race-neutral reasons supplied by prosecutors can be false or pretextual. As the *Miller-El* court acknowledged, "[i]f any facially neutral reason sufficed to answer a *Batson* challenge, then *Batson* would not amount to much more than [the prior precedent]. Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand." *Id.* at 240. Thus, as the court emphasized in *Miller-El*, a court reviewing a *Batson* challenge must consult "'all relevant circumstances.'" *Id.,* quoting *Batson* at 96-97.

{¶ 24} The assessment of "all relevant circumstances" includes, among other things, conducting a comparative juror analysis — at least when the record is adequate to do so — to determine whether the prosecutor's proffered race-neutral reason for excluding a minority juror "applies just as well to an otherwise-similar

[nonminority juror] who is permitted to serve[.]" *Id.* at 241. If it does, "that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Id.*

{¶ 25} The instant case appears to present the first opportunity for our court to consider a trial court's ruling on a *Batson* challenge in light of the United States Supreme Court's recent decision in *Flowers v. Mississippi*, 588 U.S. ___, 139 S.Ct. 2228, 204 L.Ed.2d 638 (2019), and its assessment of "all relevant circumstances."

{¶ 26} In *Flowers*, defendant, Curtis Flowers ("Flowers"), was tried six separate times for the murder of four employees of a Mississippi furniture store. Flowers is black and three of the victims were white. At the first two trials, the state of Mississippi used its peremptory strikes on all of the qualified black prospective jurors. In the first two cases, the jury convicted Flowers and sentenced him to death, but the convictions were later reversed by the Mississippi Supreme Court based on prosecutorial misconduct. At the third trial, the state used all of its 15 peremptory strikes against black prospective jurors, and the jury convicted Flowers and sentenced him to death. The Mississippi Supreme Court reversed again, this time concluding that the state exercised its peremptory strikes on the basis of race in violation of *Batson*. *Id.* at 2236-2237.

{¶ 27} Flowers's fourth and fifth trials ended in mistrials. In the fourth trial, the state exercised 11 peremptory strikes, all against black prospective jurors. There was no available racial information on the prospective jurors in the fifth trial. At the sixth trial, the state exercised six peremptory strikes. This time it used five

challenges against black prospective jurors and allowed one black juror to be seated. Flowers raised a *Batson* claim at the sixth trial, but the court concluded that the state offered race-neutral reasons for each of the five peremptory strikes. Flowers was convicted by the jury and was sentenced to death. The Mississippi Supreme Court affirmed. After this, the United States Supreme Court vacated that judgment and remanded in light of *Foster v. Chatman*, 578 U.S. ___, 136 S.Ct. 1737, 195 L.Ed.2d 1. On remand, the Mississippi Supreme Court again upheld Flowers's conviction. *Flowers* at 2237-2238.

{¶ 28} In reviewing the *Batson* challenge, the court found the following four critical facts, when taken together, required the reversal of the Mississippi Supreme Court:

> *First*, in the six trials combined, the State employed its peremptory challenges to strike 41 of the 42 black prospective jurors that it could have struck — a statistic that the State acknowledged at oral argument in this Court. Tr. of Oral Arg. 32. *Second*, in the most recent trial, the sixth trial, the State exercised peremptory strikes against five of the six black prospective jurors. *Third*, at the sixth trial, in an apparent effort to find pretextual reasons to strike black prospective jurors, the State engaged in dramatically disparate questioning of black and white prospective jurors. *Fourth*, the State then struck at least one black prospective juror, Carolyn Wright, who was similarly situated to white prospective jurors who were not struck by the State.

(Emphasis sic.) *Id.* at 2235.

{¶ 29} The *Flowers* court did not decide that any one of these four facts alone required reversal. Rather, it decided that "all of the relevant facts and circumstances taken together establish that the trial court at Flowers['s] sixth trial committed clear error in concluding that the State's peremptory strike of black prospective juror

Carolyn Wright was not motivated in substantial part by discriminatory intent." *Id.* at 2251.

{¶ 30} A review of the relevant history of the case revealed that the state's peremptory strikes in Flowers's first four trials strongly supported the conclusion that its use of peremptory strikes in Flowers's sixth trial was motivated in substantial part by discriminatory intent. The state tried to strike all 36 black prospective jurors over the course of the first four trials. The *Flowers* court stated:

> the State employed its peremptory strikes to remove as many black prospective jurors as possible [during the first four trials]. The State appeared to proceed as if *Batson* had never been decided. The State's relentless, determined effort to rid the jury of black individuals strongly suggests that the State wanted to try Flowers before a jury with as few black jurors as possible, and ideally before an all-white jury. The trial judge was aware of the history. But the judge did not sufficiently account for the history when considering Flowers'[s] *Batson* claim.

*Id.* at 2246.

{¶ 31} With regard to the sixth trial, the court noted that the state's use of peremptory strikes in Flowers's sixth trial followed the same pattern as the first four trials. *Id.* The court next considered the state's disparate questioning of black and white prospective jurors in the jury selection process for Flowers's sixth trial, noting that disparate questioning can be probative of discriminatory intent. *Id.* at 2247, citing *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

{¶ 32} In *Flowers*, the state spent far more time questioning the black prospective jurors than the accepted white jurors — 145 questions asked of 5 black prospective jurors and 12 questions asked of 11 white seated jurors. *Id.* at 2246-

2247. The court concluded that the historical evidence from the earlier trials, as well as the state's striking of five of six black prospective jurors at the sixth trial, and the dramatically disparate questioning and investigation of black prospective jurors and white prospective jurors at the sixth trial strongly suggest that the state was motivated in substantial part by a discriminatory intent. *Id.* at 2248.

{¶ 33} Lastly, the court noted that a comparison of prospective jurors who were struck and not struck could be an important step in determining whether a *Batson* violation occurred. *Id.*, citing *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008). In *Flowers*, a black prospective juror was struck, in part, because she knew several defense witnesses and had worked at Wal-Mart where Flowers's father also worked. *Id.* at 2249. However, three white prospective jurors also knew many individuals involved in the case, and the state asked them no individual questions about their connections to witnesses. *Id.* White prospective jurors also had relationships with members of Flowers's family, but the state did not ask them follow-up questions in order to explore the depth of those relationships. *Id.* The state also incorrectly explained that it exercised a peremptory strike against Wright because she had worked with one of Flowers's sisters and made apparently incorrect statements to justify the strikes of other black prospective jurors. *Id.* at 2250.

{¶ 34} The *Flowers* court found that the overall context of the circumstances required skepticism of the state's strike of the prospective juror, Carolyn Wright. *Id.* In reaching its conclusion, the court examined the whole picture, which included the

history of the state's use of peremptory strikes in the prior trials, the state's decision to strike five out of six black prospective jurors at Flowers's sixth trial, and the state's vastly disparate questioning of black and white prospective jurors during jury selection at the sixth trial, and concluded the trial court "clearly erred in ruling that the State's peremptory strike of Wright was not motivated in substantial part by discriminatory intent." *Id.* at 2250-2251.

{¶ 35} With the above in mind, we now turn to the facts of the instant case.

{¶ 36} Here, the state's exercise of its seven peremptory challenges resulted in the removal of four African-American persons as jurors. Defense counsel raised a *Batson* challenge on behalf of both defendants after the fourth prospective, African-American juror was removed. In observing a pattern by the state of excluding African-Americans, defense counsel stated: "Your Honor, I would just indicate for the record my client is an African-American. The juror that was just excused is an African-American. This is the fourth out of seven peremptories that the State has exercised on an African-American, and I would ask for a neutral reason."

{¶ 37} Upon this challenge, the court required the state to provide a race-neutral reason for excusing each of the four, prospective African-Americans jurors. The state explained prospective juror No. 1 was excused because "he repeatedly told us that he had problems making decisions * * * and he was going to say anything that was going to get him off this jury." The trial court agreed that this was a race-neutral reason because this prospective juror made it clear that he did not want to

participate in the trial by revealing more negative facts. While both Kirk and Morris agree that the state's exclusion of this juror was based upon race-neutral grounds, they contend there was a pattern of racially motivated removals of the prospective African-American jurors when the four peremptory challenges are examined together. We agree. As the *Flowers* court stated,

> [W]e need not and do not decide that any one of those four facts alone would require reversal. All that we need to decide, and all that we do decide, is that all of the relevant facts and circumstances taken together establish that the trial court at Flowers'[s] sixth trial committed clear error in concluding that the State's peremptory strike of black prospective juror Carolyn Wright was not motivated in substantial part by discriminatory intent. In reaching that conclusion, we break no new legal ground. We simply enforce and reinforce *Batson* by applying it to the extraordinary facts of this case.

*Id.* at 2251.

{¶ 38} In the instant case, with regard to prospective juror No. 2, both Kirk and Morris argue the state's exclusion was not race-neutral, despite assurances by this juror that she could be fair and impartial. The state explained that its race-neutral basis was that while this prospective juror did not personally know defense counsel, she had multiple relatives and friends accused of crimes and friends who had been represented by defense counsel and "had nothing but good things to say about [him]." The trial court did not find discriminatory intent in the state's explanation and added that this prospective juror was molested as a child by a family member.

{¶ 39} The state explained that prospective juror No. 3 was excluded because of her previous relationship with a sex offender. The trial court reasoned that since

the ex-boyfriend was likely on postrelease control during the time he had been dating prospective juror No. 3, the state's exclusion of the prospective juror was neutral as to race. Both Kirk and Morris argue that this reasoning is misplaced because at the time of trial prospective juror No. 3 had not talked to her ex-boyfriend for three years. Additionally, she stated that she did not participate in her ex-boyfriend's court case or his postrelease control. Prospective juror No. 3 maintained that she would remain fair and impartial.

{¶ 40} Kirk contends nothing in the record indicates that prospective juror No. 4 would be an inattentive juror, a biased juror, or an untruthful juror. Morris contends that the most glaring example of the state's "inability to articulate a racially neutral reason for the exclusion of an African-American juror was seen in the exclusion of [prospective juror No. 4]." The following exchange took place during the voir dire of this juror:

> [STATE]: What do you do for a living, [prospective juror No. 4]?
> [PROSPECTIVE JUROR NO. 4]: I am an engineer.
> [STATE]: How long have you been an engineer for?
> [PROSPECTIVE JUROR NO. 4]: Roughly a year.
> [STATE]: Okay, and where do you work?
> [PROSPECTIVE JUROR NO. 4]: Courtyard by Marriott.
> [STATE]: And what do you do as an engineer for them?
> [PROSPECTIVE JUROR NO. 4]: Maintenance. I fix everything from light fixtures to broken air conditioners, chillers on the roof, things of that nature.

{¶ 41} At the *Batson* challenge, the state's race-neutral basis for this prospective juror was his body posture and its perception that this prospective juror was not "fully honest" when questioned. The state explained:

[when] the State was questioning him, he had angled his body further * * * in a way that the State found he was not being fully honest with the State when questioned.

When he was asked about his job, he indicated an engineer then went further into what was really a maintenance man job. Certainly the State has some concerns about someone who is up stating their job for lack of a better phrase, but it was not based on his ethnic background.

{¶ 42} The trial court agreed, noting "the same thing about his up stating the job and about his body language." The court "thought it was disrespectful." In overruling the request, the court noted "there are still many African-Americans still on this jury[,]" but no record was made as to the final composition of the jury.

{¶ 43} We agree with Kirk and Morris that the state's use of peremptory challenges in the instant case exhibited a pattern against African-Americans jurors, especially in light of its "race-neutral reason" with regard to prospective juror No. 4. Indeed, the state's mischaracterization of prospective juror No. 4's statements during the *Batson* challenge is troubling.

{¶ 44} We recognize that many people characterize themselves as engineers who work in similar capacities. Indeed, the terms "sanitary engineer" and "maintenance engineer" are commonly used. It is a misstatement to say that prospective juror No. 4 was untruthful when he called himself an engineer because this term appropriately described his employment and his responsibilities of fixing everything from light fixtures to broken air conditioners and chillers on the roof.

{¶ 45} Moreover, the state's argument that prospective juror No. 4's body language provided a legitimate reason for exclusion is unpersuasive. This court has

previously found that the state's peremptory challenge on the basis of demeanor was erroneous. *State v. Strong*, 8th Dist. Cuyahoga No. 100699, 2015-Ohio-169, *discretionary appeal not allowed*, 143 Ohio St.3d 1417, 2015-Ohio-2911, 34 N.E.3d 930.

{¶ 46} In *Strong*, the state exercised a peremptory challenge on one of the two African-American jurors on the panel without posing any questions to him. Strong objected to the state's peremptory strike of that juror and the court asked the state to provide its reasoning. The state replied: "'I don't know if you have been able to observe his demeanor. He's back in the corner, but it's a little concerning to me. He has an extremely wide-eyed look, like he has a thousand-yard stare, and I have concerns that he will not be able to pay attention.'" *Id.* at ¶ 16-17. The trial court noted that it had not observed conduct by the juror consistent with the state's description but nonetheless accepted the challenge and overruled the objection without any further inquiry into the matter. *Id.* at ¶ 18.

{¶ 47} This court found the state's proffered reason for the peremptory strike and the lack of inquiry into the matter by the trial court, in light of its admission that it had not observed the supposed inattentiveness of the juror, deeply troubling. *Id.* at ¶ 21. We noted that in the third step of the *Batson* analysis, "'"the trial court may not simply accept a proffered race-neutral reason at face value, but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual."'" *Id.* at ¶ 20, quoting *State v. Hudson*, 8th Dist. Cuyahoga No. 96986,

2012-Ohio-1345, ¶ 11, quoting *Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873

N.E.2d 1263, ¶ 65.  We went on to explain:

> The state's dubious explanation for its peremptory challenge — that based solely on the "wide-eyed" look on the juror's face, the juror could not be attentive — essentially amounts to an expression of displeasure with the physical characteristics of the juror.  We find this explanation to be both offensive and disconcerting.  Our interpretation is bolstered by the prosecutor's failure to make any inquiry of the juror before concluding the juror could not be attentive solely due to his appearance.

*Id.* at ¶ 21.

{¶ 48} In the instant case, the state argued that prospective juror No. 4 "had

angled his body * * * in a way that the State found he was not being fully honest with

the State when questioned."  This led to the state's misperception that prospective

juror No. 4 could not be an engineer when he "was really a maintenance man."

However, a review of the record reveals that there was nothing that indicates that

prospective juror No. 4 would be an inattentive juror, a biased juror, or an untruthful

juror.

{¶ 49} When questioned by the state, prospective juror No. 4 responded:

> [STATE]:  Now you have heard I'm sure a million questions from all the different attorneys and from the Court.  Will you be able to follow the law as given to you by the judge?
> [PROSPECTIVE JUROR NO. 4]:  Yes.
> [STATE]:  Okay, and when you first heard the judge read that indictment, what were your thoughts?
> [PROSPECTIVE JUROR NO. 4]:  Proof, facts.
> [STATE]:  You want to hear the proof and the facts?
> [PROSPECTIVE JUROR NO. 4]:  Yeah.  The meat and gravy of the whole situation.
> [STATE]:  Okay, and that's what we're asking for.  If you're picked to serve on the jury, you get to listen to the evidence and make a decision

after the judge gives you the law.  Do you think that you'll be able to do that?
[PROSPECTIVE JUROR NO. 4]:  Yes.
[STATE]:  You're someone who can make a decision?
[PROSPECTIVE JUROR NO. 4]:  Yes.

{¶ 50} Based on this exchange, prospective juror No. 4 indicated that he would be fair and impartial.  Yet, he was the fourth African-American juror excluded by the state in its seven peremptory challenges.

{¶ 51} Just as in *Strong*, in the instant case, we are troubled by the state's proffered reasons for its peremptory challenges, in light of the fact that both the defense and the state previously questioned the juror and he answered questions appropriately.  The state's explanation for its peremptory challenge regarding prospective juror No. 4 — that based on the juror's body posture and his "engineer" response, the juror was dishonest — essentially amounts to an expression of displeasure with the physical characteristics of the juror.  We find this explanation to be disconcerting.  Our finding is supported in the record by the state's failure to make any inquiry of the "specific body language" or the truthfulness of this juror before excluding this prospective juror from the panel.  Rather, the record demonstrates that this juror indicated that he possessed no reservations about his ability to serve as a juror.  His responses were appropriate and articulate.

{¶ 52} Under *Flowers*, we must examine the whole picture and look at the exclusion of prospective juror No. 4 in the context of all the facts and circumstances.  *Id.* at syllabus.  The overall context here requires skepticism of the state's striking of prospective juror No. 4 when examining the state's race-neutral reasons for

excluding this juror in conjunction with the exclusion of prospective juror Nos. 1-3. In light of all the facts and circumstances, we conclude that the trial court erred in ruling that the State's peremptory strike of prospective juror No. 4 was not motivated in substantial part by discriminatory intent. *Id.*

{¶ 53} Therefore, Kirk's first assignment of error and Morris's supplemental assignment of error are sustained.

{¶ 54} In Kirk's second assignment of error, he contends the trial court erred when it did not allow him to examine a witness on recross. In Morris's first through fourth assignments of error, he challenges his convictions and sexual predator classification. These remaining assignments of error, however, are moot in light of our disposition of Kirk's first assignment of error and Morris's supplemental assignment of error. App.R. 12.

{¶ 55} As we stated in *Strong,*

> We note that a reversal under *Batson* "does not mean that a guilty defendant must go free. For indictments can be returned and convictions can be obtained by juries selected as the Constitution commands." *Patton v. Mississippi*, 332 U.S. 463, 469, 68 S.Ct. 184, 92 L.Ed. 76 (1947), citing *Hill v. Texas*, 316 U.S. 400, 406, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); *State v. Russell*, 2d Dist. Montgomery No. 25467, 2013-Ohio-5166, ¶ 6; *Winston v. Boatwright*, 649 F.3d 618 (7th Cir. 2011) ("[W]hen a violation of equal protection in jury selection has been proven, the remedy is a new trial, without the need for any inquiry into harmless error or examination of the empaneled jury.")

*Id.* at ¶ 33.

{¶ 56} Accordingly, judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.

It is ordered that appellants recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, ADMINISTRATIVE JUDGE

ANITA LASTER MAYS, J., CONCURS;
LARRY A. JONES, SR., J., DISSENTS (WITH SEPARATE OPINION ATTACHED)

LARRY A. JONES, SR., J., DISSENTING:

{¶ 57} Respectfully, I dissent and would overrule Kirk and Morris's *Batson* challenge. The record here demonstrates that the state used four peremptory challenges against African-American prospective jurors. At the time the defense made its *Batson* challenge, the state had exercised a total of seven peremptory strikes. At the trial-court level, the defense contended that all four strikes demonstrated a pattern of excluding African-American jurors.

**Prospective Juror No. 1**

{¶ 58} On appeal, both Kirk and Morris concede that the strike of prospective juror No. 1, was not problematic, that is, that the state demonstrated a

race-neutral reason for the strike. Specifically, that prospective juror indicated that he had problems making decisions and standing in judgment of others.[4]

{¶ 59} Nonetheless, Kirk and Morris contend, and the majority agrees, that although the "state's exclusion of this juror was based upon race-neutral grounds, * * * there was a pattern of racially motivated removals of the prospective African-American jurors when the four peremptory challenges are examined together." Majority Opinion, ¶ 32.

{¶ 60} My review of the voir dire of this prospective juror shows he had an attitude of unwillingness to participate; I would therefore completely remove him from the *Batson* analysis.

**Prospective Juror No. 2**

{¶ 61} Prospective juror No. 2 indicated that she had multiple family members and friends involved in the criminal justice system. When asked when was the last time a family member or friend had been charged with a crime, she responded "[p]robably last week," and elaborated that the charges were "across the board." Prospective juror No. 2 also indicated that some of her friends and family members had been represented by the same counsel representing Morris and that those family members and friends had "nothing but good things" to say about him.

---

[4] The record also shows that late in the voir dire process, after the panel as a whole had been asked about any dealings they had had with crimes, including being a victim, and initially without any indication from prospective juror No. 1, he told the court that he had been molested as a teenager. When asked if that would pose a problem for him as a juror, he replied, "[i]t might be. Like I said * * * I have issues * * * judging people."

When asked how many family and friends defense counsel had represented, prospective juror No. 2 stated, "God, there are so many of them." She acknowledged that she did not personally know the attorney, however.

{¶ 62} The assistant prosecuting attorney questioned prospective juror No. 2 about the possibility that her (the assistant prosecutor's) colleagues may have prosecuted some of her family members and friends. The prospective juror acknowledged that that may be true and indicated that she thought they did a good job. Immediately after that response the trial court said to prospective juror No. 2, "I don't find this funny," suggesting that the prospective juror had laughed, smiled, or in some other way appeared to not be taking the question and/or proceeding seriously. Prospective juror No. 2 apologized and stated that "if you do something wrong, you have to be accountable for the things you do wrong."

{¶ 63} Additionally, prospective juror No. 2 stated that she had been molested by a family member as a child, she never told anyone about it until she was an adult when she only told family members, and it was never reported to law enforcement. She stated that she would be able keep her experience separate from this case, and that she had no ill will about what had happened to her, and that, in fact, she had made peace with her molester.

{¶ 64} The state's proffered race-neutral explanation for striking prospective juror No. 2 was that she had family members and friends who had been prosecuted for sexually based crimes, and some of those prosecutions had been recent. The

state further offered the prospective juror's "endorsement" of Morris's counsel as a ground for excusing her.

{¶ 65} On this record, I would find the state's exercise of a peremptory against prospective juror No. 2 was race-neutral.

**Prospective Juror No. 3**

{¶ 66} Prospective juror No. 3 revealed that she had an ex-boyfriend who was a convicted sex offender. The crime occurred before she started dating him, and at the time of this trial she had not dated him for three years. She was not sure as to whether he was on postrelease control when they were dating. She acknowledged that she knew about the case from only her ex-boyfriend's perspective, but stated that she would be fair and impartial to the state. She indicated that she wanted to serve on the jury.

{¶ 67} The state's proffered race-neutral explanation for striking prospective juror No. 3 was her prior relationship with a convicted sexual offender, from whom she solely learned about his case. The trial court accepted the reason and added that it was "likely" that the ex-boyfriend had been on postrelease control at the time the prospective juror dated him.

{¶ 68} Although I do not agree with the trial court's speculation that the ex-boyfriend was "likely" on postrelease control when prospective juror No. 3 dated him, I would find her prior relationship with a convicted sex offender to be a race-neutral ground for striking her.

**Prospective Juror No. 4**

{¶ 69} The state's striking of the remaining juror at issue, prospective juror No. 4, is what I believe is really at issue here and is the juror the majority mainly relies on to demonstrate a *Batson* violation.

{¶ 70} When asked by the assistant prosecuting attorney about his occupation, the prospective juror responded that he was an engineer. The assistant prosecuting attorney further questioned him about his employment, asking "and what do you do as an engineer for [Courtyard by Marriott]?" Prospective juror No. 4 replied, "maintenance. I fix everything from light fixtures to broken air conditioners, chiller on the roof, things of that nature."

{¶ 71} As its race-neutral explanation for striking the prospective juror, the state questioned his credibility because it believed that he was "up stating" his job and also that his body language was concerning. The trial court agreed, stating "Frankly, I noted the same thing about his up stating the job and about his body language. I thought it was disrespectful."

{¶ 72} The majority finds that the state "mischaracterized" prospective juror No. 4's statement that he was an engineer, stating that "many people characterize themselves as engineers who work in similar capacities. Indeed, the terms 'sanitary engineer' and 'maintenance engineer' are commonly used." Majority opinion, ¶ 38. Thus, the majority finds that it was a "misstatement to say that [the prospective juror] was untruthful when he called himself an engineer, as this term appropriately

described his employment and his responsibilities fixing everything from light fixtures to broken air conditioners and chillers on the roof." *Id.*

{¶ 73} I understand that "sanitary engineer" and "maintenance engineer" are common descriptions for jobs in sanitation and maintenance. But the prospective juror did not qualify what type of engineer he was; rather, he just stated that he was an engineer. I think what has always been a tenet in the law about credibility holds true for jury selection. That being, that as a court of review, we generally afford deference to the determinations of credibility that occur in the trial court, where the trier of fact, or here, the court and the assistant prosecuting attorney, are witnessing the juror firsthand.

{¶ 74} As the Ohio Supreme Court has held,

> Review of a *Batson* claim largely hinges on issues of credibility. Accordingly, we ordinarily defer to the findings of the trial court. *See Batson* at 98, 106 S. Ct. at 1724, 90 L. Ed. 2d at 89, fn. 21. Whether a party intended to racially discriminate in challenging potential jurors is a question of fact, and in the absence of clear error, we will not reverse the trial court's determination. *Hernandez v. New York*, 500 U.S. at 369, 111 S. Ct. at 1871, 114 L. Ed. 2d at 412; *State v. Hernandez*, 63 Ohio St. 3d at 583, 589 N.E.2d at 1314. Trial judges, in supervising voir dire, are best equipped to resolve discrimination claims in jury selection, because those issues turn largely on evaluations of credibility. *See Batson* at 98, 106 S. Ct. at 1724, 90 L. Ed. 2d at 89, fn. 21.

*Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 102, 676 N.E.2d 872 (1997).

{¶ 75} In addition to concerns about prospective juror No. 4's credibility, which I would find were race-neutral, the state also believed his body language was concerning. The majority relies on this court's decision in *State v. Strong*, 8th Dist. Cuyahoga No. 100699, 2015-Ohio-169, *discretionary appeal not allowed*, 143 Ohio

St.3d 1417, 2015-Ohio-2911, 34 N.E.3d 930, for the proposition that the "state's peremptory challenge on the basis of demeanor was erroneous." Majority opinion at ¶ 39. *Strong* is distinguishable from this case, however.

{¶ 76} In *Strong*, the jury panel consisted of 22 people; only two were African-Americans. Defense counsel initially objected to the composition of the panel, and the trial court overruled the objection. During voir dire, the state exercised a peremptory challenge on one of the African-American jurors *without posing any questions to him*; only the court and defense counsel had questioned him. The defense raised a *Batson* challenge, and the state offered the following reasons for striking him:

> I don't know if you have been able to observe his demeanor. He's back in the corner, but it's a little concerning to me. He has an extremely wide-eyed look, like he has a thousand-yard stare, and I have concerns that he will be able to pay attention.

*Strong* at ¶ 17.

{¶ 77} The trial court stated that it *had not* observed the demeanor the state mentioned. Nonetheless, the trial court allowed the state to strike the juror and overruled the defense's challenge without any further inquiry into the matter. This court was "deeply troubled by both the state's proffered reason for the peremptory strike and the lack of inquiry into the matter by the trial court in light of its admission that it had not observed the supposed inattentiveness of the juror." *Id.* at ¶ 21.

{¶ 78} This court further found it "dubious" that the state relied on the juror's "wide-eyed" look to support its believe that the juror could not pay attention,

finding that explanation as amounting to "an expression of displeasure with the physical characteristics of the juror." *Id.* This court, citing the precedent in *State v. Brown*, 8th Dist. Cuyahoga No. 84059, 2004-Ohio-6862, acknowledged that body language and demeanor are permissible race-neutral reasons for peremptory challenges, but in *Strong*, found that "[in] fact, it was not the juror's body language that was being questioned but his physical appearance." *Id.* at ¶ 23.

{¶ 79} The majority finds that the state essentially expressed displeasure with prospective juror No. 4's physical characteristics. *See* majority opinion, ¶ 45. I disagree. The state specifically stated that it had concerns about his credibility, body language, and demeanor, which, as mentioned, have all been held to constitute permissible race-neutral justifications for striking a juror.

{¶ 80} Further, although the record is not clear how many African-Americans were on the panel, the trial court noted that, even with the four who were excluded "there are still many African-Americans on this jury." I find it telling that after the jury was empanelled, the defense, which was represented by competent, seasoned criminal defense counsel, did not renew its objection to the composition of the jury. Thus, this case is distinguishable from *Strong*, where there were only two African-Americans on the panel, and one was excluded.

{¶ 81} Moreover, unlike in *Strong*, the state did question prospective juror No. 4 before striking him — it was the answer to the state's question that led it, in part, to strike him based on its doubt about his credibility. And unlike in *Strong*, the trial court agreed with the state that prospective juror No. 4 had "up stated" his

job, and noted that it had observed his demeanor, which the court found "disrespectful." This case therefore presents a different scenario than *Strong*, where the trial court upheld the state's strike when the state had not questioned the juror and despite the fact that the court had not observed or shared the state's concern about the juror.

{¶ 82} In addition to *Strong*, the majority also relies on the recent United States Supreme Court case addressing *Batson* challenges and finding that the state of Mississippi had a persistent pattern of striking African-American jurors in the prosecution of the defendant, *Flowers v. Mississippi*, 588 U.S. ___, 139 S.Ct. 2228, 204 L.Ed.2d 638 (2019). I agree that Flowers, the African-American defendant in the death-penalty prosecution, did not receive a fair trial because of Mississippi's pattern of discrimination by excluding African-American jurors, but I find the circumstances of this case distinguishable from Flowers's case.

{¶ 83} Most notably, Flowers was tried six separate times, and in the combined voir dires of all six trials, the state of Mississippi used its peremptory challenges to strike 41 of the 42 African-American prospective jurors. And it was not until the final, sixth trial that the state seated the sole African-American juror.

{¶ 84} The United States Supreme Court held that Flowers's *Batson* challenge, under the "extraordinary facts of this case," had to be considered in light of all six of trials — I agree; in fact, the Mississippi state courts had already twice

concluded that the state had violated *Batson*.[5]  The majority extrapolates the Court's finding to mean that we have to consider the exclusion of all four prospective African-American jurors, even prospective juror No. 1 which it concedes was excluded upon race-neutral grounds, as demonstrating a pattern of racially motivated removals.  That reasoning is circular and I disagree with it.

{¶ 85} In sum, I believe that the only juror at issue here was prospective juror No. 4.  One peremptory strike does not create an inference of purposeful exclusion on the account of race.  *Hicks*, 78 Ohio St.3d at 99, 676 N.E.2d 872.  We should not disturb a trial court's decision on a *Batson* challenge unless we find it to be clearly erroneous.  *State v. Moseley*, 8th Dist. Cuyahoga No. 92110, 2010-Ohio-3498, ¶ 35.

{¶ 86} I do not find the exclusion here clearly erroneous.  And as noted by the trial court, and which was not contested by the defense, there were other African-Americans on the jury.

{¶ 87} In light of the above, I respectfully dissent and would affirm the trial court's decision on the *Batson* challenge.

---

[5] *Flowers* at 2235.